<pre>
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF NEW YORK
 2  -----------------------------------x
    UNITED STATES OF AMERICA      :    Docket No. 06CR6009
 3                                 :
                         vs.       :
 4                                 :
    MARIAN ASENVO PENEV            :
 5                Defendant        :
    --------------------------------x Trial
 6
                    Transcript of Proceedings
 7             Before Honorable Charles J. Siragusa
                 United States District Judge
 8
                           Tuesday
 9                    October 10, 2006
                    Rochester, New York
10                       9:00 a.m.

11   A p p e a r a n c e s :
            RICHARD RESNICK, ESQ.
12          Assistant United States Attorney
            6200 Federal Building
13          Rochester, New York 14614

14          DONALD THOMPSON ,ESQ.
            16 West Main Street, Suite 243
15          Rochester, New York 14614
            Attorney for Defendant
16


17


18


19


20

21  Reported By:

22  Karen J. Bush

23  Official Court Reporter

24  U.S. District Court - WDNY

25  (585) 613-4312
</pre>

1        THE COURT:  This is the matter of the United States

2   vs. Marian Penev.  Are you Marian Penev?

3        THE DEFENDANT:  Yes.

4        THE COURT:  And you're appearing with your attorney

5   Mr. Thompson?

6        THE DEFENDANT:  Yes.

7        THE COURT:  The Court notes the presence of Mr.

8   Resnick on behalf of the government.  This is on for the

9   argument of motions.  In that regard, I have received and read

10  Mr. Thompson's Notice of Motion dated September 22, 2006,

11  along with the Government's response dated October 6th, 2006.

12  If we could work off of Mr. Thompson's Notice of Motion.

13  We'll go first to motions to suppress evidence from evidence

14  seized from Mr. Penev in November at Mr. Penev's home.  It's

15  essentially the position of Mr. Thompson that the execution of

16  the warrant signed by, I believe, Judge Renzi exceeded the

17  scope and that items were seized that were not particularized

18  in the warrant, and it's appears to be the defendant's

19  position that consequently the remedy would be to suppress all

20  evidence seized, is that essentially correct?

21       MR. THOMPSON:  Or that at the minimum that which was

22  seized which was outside the scope of the warrant.

23       THE COURT:  And the Government opposes that motion.

24  And, essentially, the Government maintains that everything

25  seized was within the scope of the warrant.  That is, it was

1  pursuant to the particularization authorized by the warrant

2  or, alternatively, Mr. Resnick,  it appears the position of

3  the government, that to the extent that anything should be

4  seized, it was not the items that the government seeks to use;

5  is that correct?

6          MR. RESNICK:  Yes.  Well, there are two handwritten

7  notes that I believe Mr. Thompson would argue were outside the

8  scope.

9          THE COURT:  I'm looking at the, first of all, the

10 issue of searching, the issue -- the applicable statement of

11 law is set forth in *United States vs. Shi Yan Liu*, 239 F. 3d

12 138, 140 to 142, a 2000 Second Circuit case.  And I'll read

13 the pertinent language says:  "Appellants next argue that the

14 INS agents' search was conducted in "flagrant disregard" of

15 the warrant so that all fruits of the search must be

16 suppressed.  Again, we disagree.  Government agents' flagrant

17 disregard the terms of a warrant so that wholesale suppression

18 is required only when they effect a widespread seizure of

19 items that were not within the scope of the warrant and, (2),

20 do not act in good faith."

21         Also, I would note some helpful language from *United*

22 *States vs. Longo* at 70 F. Supp 2d 225 at 250 to 251, a 1999

23 Second Circuit case.  States, "while the purpose of the

24 particularity requirement is to avoid leaving to "the unguided

25 discretion of the officers executing the warrant the decision

1   as to what items may be seized," the particularity requirement

2   is not so exacting as to eliminate all discretion of the

3   officers.  Once a category of seizable papers has been

4   adequately described, the description delineated in part by an

5   illistrative list of seizable items, the Fourth Amendment is

6   not violated because the officers executing the warrant must

7   exercise some minimal judgment." So, I do note, Mr. Thompson,

8   you've attached the inventory, that is, the property list of

9   what was seized and I'm looking at it -- evidence bag

10  containing blank documents with name and address, the Court

11  finds that certainly is within the scope of the warrant.  I do

12  note the warrant, which you've already also been good enough

13  to attach, indicates that what can be seized is, quote, "any

14  printed material related to the ownership, use, including, but

15  not limited to, documentation of the residence of the

16  aforementioned premise."  It seems to the Court obviously

17  within the scope of the warrant.  The next items Norton

18  Anti-virus key paperwork; Epson PC card adapter for memory

19  stick; Sony VAIO PCY RX550 Ultra; evidence bag containing 30

20  CDs; evidence bag containing floppys.  Again, the Court finds

21  that's within the scope of the warrant.  The warrant starts

22  off by directing the seizure of any and all computer equipment

23  as defined under Section 156 of the New York State Penal Law

24  capable of creating, maintaining, storing, retrieving,

25  modifying and/or communicating computer data as defined under

1    Section 156 of the New York State Penal Law.

2            Moving to page 2.  CD case, Sentry, black in color,

3    with CDs; CD case SoundGear, black in color with CDs; CD Base,

4    black in color, with CDs.  Again, the Court finds that is all,

5    based on the law that I read and the inventory that you

6    provided, within the scope of the warrant.  Moving to, camera

7    with case, Nikon; video camera.

8            The Court notes that the warrant additionally allows

9    for the seizure of any and all media depicting the sexual

10   performance of a child/obscene sexual performance, if any, of

11   a child and/or child erotica including:  Magnetic media,

12   printed media, caricatures, animations, letters, stories,

13   personal logs, and/or photographs -- appears that -- the Court

14   finds that those items are within the scope of the warrant.

15           MR. THOMPSON:  Judge, if I could be heard on that,

16   briefly.

17           THE COURT:  Yes.

18           MR. THOMPSON:  That is, I contrast with the more

19   usual computer search warrant application where oftentimes

20   there is a partial search of the computer at the location and

21   a determination that it does or does not contain media or

22   depictions that are within the scope of the warrant.  Here, I

23   believe this was a standard camera and no indication that it

24   contained any of the items that would be described within the

25   scope of the warrant.

1          THE COURT:  I understand, Mr. Thompson.  In the

2    event that a Court disagrees that it was within the scope of

3    the warrant, certainly it appears under the law that I've

4    cited that seizure of all of the items seized would not be the

5    appropriate remedy.  There is nothing set forth that would

6    indicate that in this case the search was conducted in

7    flagrant disregard of the warrant and that the conditions

8    required for wholesale suppression -- and, again, the logic

9    is, as you point out, and I certainly agree with wholesale

10   suppression is called for in a situation where the search

11   becomes a general warrant where the police start grabbing

12   everything and anything.  Here, certainly that -- there does

13   not appear any allegations that would support such

14   determination.  In that respect, specifically the Court finds

15   that a hearing would not be required and I'm denying that

16   application.  Because, even if your allegations were proven,

17   the Court does not determine that, as a matter of law, that

18   would not, under the authority of *Shi Yan Liu* lead to

19   wholesale suppression.  There is nothing in the allegations

20   which in any way indicate a widespread seizure of items that

21   were not within the scope of the warrant and certainly don't

22   establish that the police were acting in bad faith.  Even if

23   the Court were to disagree that the court were to examine

24   these items, if they appear to be within the scope of the

25   warrant and the two cameras, in any event, are not being

 1  sought to be introduced at trial; is that correct, Mr.

 2  Resnick?

 3          MR. RESNICK:  Yes, yor Honor.

 4          MR. THOMPSON:  I was going to mention that it

 5  doesn't look like either of the cameras or any of the images

 6  off of the cameras are part of Government's 12 B, it's maybe a

 7  more or less moot point.

 8          THE COURT:  Okay.  Again, I would continue, if

 9  you're maintaining everything should still -- it's your

10  position that everything should be suppressed.

11          MR. THOMPSON:  In the first instance.

12          THE COURT:  So, I do want to go through the analysis

13  to see what was seized.  Next page, evidence bag containing

14  photos and written notes; CDs; Kodak camera, serial number

15  specified; a Cannon camera; evidence bag containing

16  photographs; and NECC telephone bill and Samsung cell phone.

17  The Court finds, again, that all those items are within the

18  scope of the warrant.  To the extent that any individual item

19  is not -- for example, an appellate court would recognize your

20  argument that they should have looked, they didn't need to

21  seize it.  The Court finds even if your allegations, as set

22  forth in the motion papers were proven out, that would not

23  lead to the entire suppression of all of the evidence because,

24  again, the two requirements set forth in the *Shi Yan Liu* case

25  would not be satisfied.  Finally, evidence bag containing CD

1  and case, along with Base case with 17 CDs.  Again, the Court

2  finds that that is clearly within the scope of the warrant.

3  Now, I'm going back to the preceding 12, because I assume

4  written notes that are under item 12 on 3 of 4 are what you're

5  offering that you intend to use at trial.  Is that correct,

6  Mr. Resnick?

7            MR. RESNICK:  At this point in time, yes, your

8  Honor.

9            THE COURT:  And I want to clarify that we're talking

10 about two written notes, that's what you're referring to on

11 page 2 of your response, it says two handwritten notes.

12            MR. RESNICK:  Yes, they were found at the residence.

13            THE COURT:  Again, I haven't seen the handwritten

14 notes.  Mr. Thompson is maintaining they're not covered by the

15 warrant.  Presumably they were seized because they're somehow

16 relevant to the items authorized by the warrant.  What do they

17 say?  What do the notes say?

18            MR. RESNICK:  I can hand it up to the Court.

19            MR. THOMPSON:  Judge, if I could, while you are

20 reading.

21            THE COURT:  You obviously saw this.

22            MR. THOMPSON:  I know the Court is familiar with the

23 scope of the warrant, which permits the seizure of items

24 containing evidence or evidence of criminal activity.  For

25 another thing, I don't think the note falls within either of

1   those two.

2          THE COURT:  Unless you can tell me -- what is clear,

3   of course, as we all know, Mr. Resnick, in the course of

4   executing a search warrant, if the police come across in plain

5   view instrumentalities of crime, contraband or evidence of a

6   crime, then they're authorized to seize that.  Clearly this is

7   not -- I'm looking again at the specification.

8          MR. RESNICK:  It talks about letters, stories.

9          THE COURT:  Let me go back.  You might be right.

10  Further, property to be seized consist of a cellular phone,

11  any and all media depicting the sexual performance of a child

12  obscene sexual peformance of a child and/or child erotica

13  including:  Magnetic media, printed media, charicatures,

14  animations, letters, stories, personal logs and/or photographs

15  -- now, this is the key, so we're talking about -- I want to

16  be clear, we're talking about magnetic media, printed media,

17  caricatures, animations, letters, stories, personal logs,

18  and/or photographs which may be indicative of preferential

19  sexual tendencies.

20         MR. RESNICK:  And if I can tie that document into

21  the minor document stating that it was shown to her, I believe

22  it falls right within the scope of the warrant.

23         THE COURT:  It may, and I'm trying to understand

24  your theory.  At the time the police grabbed this, they had

25  information that would tie it into the minor victim?

1    MR. RESNICK:  At the time, no, I can't say that,

2 your Honor.  They were there for a search looking for this

3 kind of evidence.

4    THE COURT:  Here is the example -- and I may reserve

5 on this -- here is the example that I would use.  You have a

6 drug search warrant and you're looking for narcotics and you

7 seize a TV and you take the TV out and after that you run a

8 check and determine the TV was stolen.  I don't know that that

9 TV would be admissible evidence.  And it strikes me that that

10 is the analogy we have here.  You're telling me that at the

11 time they seized this -- and I can read it, it says, "my heart

12 holds so much love for you, you are the greatest love of all.

13 The magic of your touch, the passion of your kiss, the

14 contentment of simply being together."  I fail, unless you can

15 tell me going in they had some information that ties that in,

16 I would be inclined, again, for the reasons I'm stating, you

17 can't just seize it and then connect it.  You have to have

18 something connecting it at the time you seize it.

19    MR. RESNICK:  Looking at the affidavit that the

20 state did, I don't see there is indication that there would be

21 love letters or notes that the minor victim saw it.

22    THE COURT:  The Court would be inclined to suppress.

23 I'm declining to suppress all the items based on the *Shi Yan*

24 *Liu* case.  And bear with me one moment.  And so there is no

25 mistake on appellate review, I'm looking at a well reasoned

case 211 F. 3d  31, a 2001 Second Circuit case, in pertinent

point, "when a search exceeds a scope of the warrant, only the

improperly seized evidence will be suppressed.  The properly

seized evidence remains admissible."  Eliminate the cites.

"The drastic means is justified unless the agent executing the

warrant effected a widespread seizure of items not within the

scope of the warrant and did not act in good faith."  Citing

the *Shi Yan Liu* case.  Again, 211 F. 3d 31, at pages 60 to 61

a 2002 District of Connecticut case.  "Flagrent disregard is

found only in extraordinary cases such as those where the

Government effects a widespread seizure of items clearly not

within the scope of a warrant and does not act in good faith

or when the lawful basis of a warrant was a pretext for

otherwise unlawful aspects of the search."  Again, there is no

basis for that conclusion and, again, the Court is denying the

application for a hearing because it's clear that burden of

proof in a motion to suppress physical evidence would be on

the defendant who seeks the suppression and an evidentiary

hearing is not required if the defendant's moving papers do

not state specific facts which have proven the necessity to

suppress the evidence.  I'm relying on 922 F. Supp. 732, at

753, a Northern District case, *United States vs. Walker* from

1996.  And what I'm determining, based on the the allegations

contained in the moving papers, even if true, would not result

in suppression under the criteria set forth in Shi Yan Liu.

1  So, the Court is going to deny the application as to the items

2  1 and 2, that is, the Sony computer and the Samsung cell

3  phone, but is going to grant it as to the two handwritten

4  notes, and is denying the defense application for the

5  wholesale suppression of evidence, again, based on the Court's

6  determination on the record.

7           Moving to evidence seized from defendant's place of

8  business.  Mr. Resnick, I'm going to put you on the spot, I

9  can't see how the -- I don't understand the theory under which

10 the foam pieces are admissible, and I'm probably missing the

11 point you're making.  I'm looking at what was asked to be

12 seized under the warrant you've attached to one to your

13 papers, and it says, "any and all computer equipment as

14 defined under Section 156.00(1) of the New York State Penal

15 Law capable of creating, maintaining, storing, retrieving,

16 modifying and/or communicating computer data, as defined under

17 Section 156(3) of the New York State Penal Law.  Further

18 property to be seized consists of:  A cellular phone, won't

19 give the number out, and any and all media depicting the

20 sexual performance of as child/obscene sexual performance of a

21 child and/or child erotica including:  Magnetic media, printed

22 media, caricatures, animations, letters, stories, personal

23 logs, and/or photographs which may be indicative of

24 preferential sexual tendencies and any and all documents,

25 notes and/or printed material related to the ownership, use,

1   including but not limited to documentation of residence at the

2   aforementioned premise."  You have to explain to me.

3        MR. RESNICK:  Being that I didn't draft the warrant,

4   I was looking at the state warrant.

5        THE COURT:  This was a state warrant.  You had input

6   no on the drafting of the warrant.

7        MR. RESNICK:  Talk to the officer that did draft it

8   if you look further a 690.10 of the state law, that is a

9   catch-all phrase.  If you see, evidence constituting the

10  crimes that are listed above.  Which are listed a here, you

11  can take that evidence.

12        THE COURT:  Sure, that's a case.  I think that is

13  standard operating procedure, if anything is in plain view and

14  it's obviously contraband, you're searching for a stolen TV,

15  but you see marijuana, you obviously can take it.  If it's an

16  instrumentality of a crime, you're searching for the stolen TV

17  and you see a sawed-off shotgun, that is clearly illegal in

18  and of itself or evidence of a crime.  Now --

19        MR. RESNICK:  Evidence of the crime.

20        THE COURT:  How on Earth would they know --

21        MR. RESNICK:  Well --

22        THE COURT:  -- that that was evidence?  I mean,

23  we're talking about what from what?  You describe a picture

24  that has rubber foam pieces, how would looking at the picture.

25        MR. RESNICK:  In the affidavit, first of all, there

1  is description of the picture and the victim alleged that the

2  sexual encounters occurred in the pit, and, therefore, in the

3  pit when they found these blocks or foam blocks that had

4  stains on them, they were taken.

5          THE COURT:  Now, there is an interesting case on

6  what you're making, but it wasn't raised *United States vs. by

7  [KWRAPB] could 998 F. 2d 1112 at pages 1116 and 1117, which is

8  a Second Circuit case from 1993 where actually cert was denied

9  at 511 U.S. 1069 because, it's interesting, because you seem

10  to be arguing that you should be able to take the affidavit

11  and the warrant and read them together.  For example, if the

12  warrant just says you can seize marijuana but the affidavit

13  makes out that it's for seizing a stolen TV, should you

14  suppress on the stolen TV?  The cases before *Bianco talked

15  about where the warrant was not only was there express

16  language of incorporation not referred to the warrant but also

17  that the affidavit was incorporated, that is not here and that

18  there is a whole other set of criteria that has not been

19  brought out here.  The warrant, the affidavit wasn't attached,

20  I haven't seen it.  But it says, I'll read the case, *"it was

21  also proper to examine the affidavit and decide the degree of

22  specifity required in the warrant.  Warrants must be read in a

23  common sense, we should not add mere corporations of attach

24  the.  Here it is clear that the involved parties were involved

25  of the scope of the limitation on the search in this case it's

1  clear that both federal agents anfala were apprised of the

2  affidavits of these factors, the affidavit was present at the

3  time of the search and spells out clearly the nature and

4  purpose of the property search and explains in detail the

5  nature of the search and when the warrant affidavits are read

6  together, there is no ambiguity, although the warrant may not

7  have explicitly Hutton who will read the after a violent sand

8  the who a [PAOEFP]-d of the seizure satisfies us that the

9  limitations included in the affidavit were observed."  None of

10 those requirements of *Bianco seem to establish or appear to

11 be here.  So, the Court has no choice based on the fact that

12 unless you can convince me that plain view applies.  Unless

13 you can convince me that -- and clearly you're right, the

14 warrant incoporates a search of -- the authorized search of

15 the entire business.

16          MR. RESNICK:  Yes.

17          THE COURT:  You have to do plain view that what was

18 in the picture.

19          MR. RESNICK:  I didn't raise plain view with respect

20 to the blocks because there was a blue special light used by

21 the officers, I would think that would take it out of plain

22 view.

23          THE COURT:  I understand that, but what is a little

24 unclear to the Court is that, as you point out, a subsequent

25 warrant was issued for the business by Judge Feldman.  And Mr.

1  Thompson does not, he concedes, couldn't really object to that

2  other than a clarification of what was seized by which date.

3         MR. THOMPSON:  Can we talk about discovery for a

4  moment?  Since we're here, it's relevant to the clarification

5  of what was seized on what date was important.  I talked to

6  Mr. Resnick and we talked back and forth about discovery.  And

7  he has continued to provide additional discovery I am not able

8  to, from the documents provided, to clarify what was seized on

9  which date and whether anything seized on the first date is

10 anything that the prosecution intends to introduce, if we get

11 so far as trial.

12         THE COURT:  I'm looking at Mr. Resnick and I may

13 have assumed wrong, Mr. Resnick, I'm looking under B, evidence

14 seized from defendant's place of business December 29th, 2005,

15 you put one what you're seeking to introduce are four foam

16 pieces seized from the pit and the business, which are

17 suspected to have the defendant's semen on them.  The

18 biological forensic report has been provided to the report I

19 assume they're positive.

20         MR. RESNICK:  Those are the four that we were

21 talking.

22         THE COURT:  They were seized on the 29th.

23         MR. RESNICK:  Yes.

24         THE COURT:  Now, they go back on the warrant on the

25 1st.

1          MR. RESNICK:  It wasn't Judge Feldman, it was a

2   state.

3          THE COURT:  Judge Keenan.

4          MR. THOMPSON:  Keenan.

5          THE COURT:  Keenan, issues a new state warrant.

6          MR. RESNICK:  That was based on the independent

7   evidence that the victim came forthwith subsequently.

8          THE COURT:  They came back.

9          MR. RESNICK:  They took 99 other blocks and those

10  99, then we've had -- some of them have been analyzed, only a

11  very few have been analyzed.  One of them had a DNA match with

12  the victim's.

13         THE COURT:  So that you can identify that that one

14  block that was taken pursuant to the search warrant.  Judge

15  Keenan signed on the first, that clearly seems that it would

16  be admissible, Mr. Thompson.

17         MR. THOMPSON:  Well, I'm not sure about that.  My

18  supposition was incorrect as to how the second warrant came

19  about.  I had presumed based on the discovery that I had that

20  these four blocks were seized in the course of the first

21  warrant, nothing was found, but additional information was

22  then supplied to the prosecution which resulted in the

23  application for the second warrant, which was then granted.

24  To the extent that the information supplied relates to these

25  four blocks that were seized, at first there might be some

1  additional challenge to be made there to the extent that it's

2  independent of the four blocks.

3          THE COURT:  I guess the -- I'm guessing that the

4  test results weren't back.  Mr. Thompson is saying, and you

5  correct me if I'm wrong, if you're saying the second warrant

6  application is part of the probable cause, the police are

7  saying, by the way, we found positive results here, so we're

8  asking to go back and get more samples, then your argument.

9          MR. RESNICK:  If you look at the affidavit attached

10 to the second warrant of the business on the first there is no

11 mention of the four blocks semen being found, now blocks were

12 taken and the victim had come forward with additional

13 information of what occurred in the picture and that was the

14 premise for going back for the second warrant.  I don't think

15 the test was done.  I'm not 100 percent correct.  I don't

16 think the test is done.

17         MR. THOMPSON:  He is right, there is nothing

18 specific in the second affidavit relating to the first four

19 blocks.

20          THE COURT:  I don't have them, I can't say that.

21          MR. THOMPSON:  We can agree on that.

22          MR. RESNICK:  Yes.

23          MR. THOMPSON:  There is nothing in the affidavit

24 relating to the first four blocks, I can't tell from the

25 discovery, they haven't provided them all to Mr. Resnick

1  relative to the blocks, whether results were available at this

2  point in time or whether they could have been utilized in the

3  application for the request for the second warrant.

4         THE COURT:  What difference does it make?  Even if

5  the test results were bad and the police officers they went to

6  someone at the DA's office and they said, you know what, I

7  don't think they'll be good because they weren't within the

8  scope of the warrant, you're going to have to make a new

9  application and develop independent probable cause.  I mean, I

10 would look at the four corners of the affidavit the same as

11 you've done and you indicated there is no reference to any

12 test results from the first four blocks, so that would not,

13 could not have been a basis on which Judge Keenan could have

14 signed the warrant.

15        MR. THOMPSON:  Or the other procedure that takes

16 place, as the Court knows, and in warrant applications, on

17 occasion is the affiant or the requesting officer will go into

18 the Court and provide the affidavit and field questions by the

19 court relative to this or that or why this is necessary or why

20 that is necessary.  In each response to which an oh by the way

21 we've already got four of the foam blocks and they tested

22 positive might have been offered up.  I don't know that from

23 the discovery I was provided at this point.  I'm looking for

24 preliminary and I talked to Mr. Resnick for the remainder of

25 the discovery that I believe that I know to be available that

1  Mr. Resnick has not been provided that will allow the timeline

2  here.

3          THE COURT:  Let's try and identify that.  Let's face

4  it, it's complicated by the Government since a lot of the

5  investigation was generated on the state side.

6          MR. RESNICK:  What was asked to be provided, I did

7  ask for it and I was told by the investigating officer was all

8  there is is a report, which I provided, and the foam blocks,

9  which we have in evidence.  And really, there is nothing else

10 they can provide me and that is all we would be presenting at

11 trial.  So, I'm not aware of anything else.  Mr. Thompson is

12 telling me, he has probably done this a lot more than I do, he

13 says there are additional reports.  I'll go back and ask for

14 them.

15         MR. THOMPSON:  I know what they told Mr. Resnick is

16 the sum total of all that they have, it's not all they have.

17 I'm familiar with the lab intake sheets and the procedure they

18 go through.

19         THE COURT:  Again, because there is a cross over

20 jurisdictions, the DNA analysis, is it capable of doing at the

21 Monroe County Lab.

22         MR. THOMPSON:  That's right.

23         THE COURT:  And it was done at the Monroe County

24 Lab.

25         MR. THOMPSON:  That's right.

1    THE COURT:  And who have you spoken to when you say.

2    MR. RESNICK:  The seizing officer, Patrick Crough.

3    THE COURT:  But, Mr. Thompson, you're maintaining

4    based on your familiarity with the testing procedures at the

5    lab.

6    MR. THOMPSON:  There are additional lab reports that

7    will track the chronology and the chain of custody.

8    THE COURT:  I'm going to ask that you contact the

9    director of the Monroe County Lab and generate reports with

10   respect to the Monroe County Lab.  With respect to the issue

11   raised, Mr. Thompson the only indication -- there is no

12   indication that the officer told the Judge anything at that

13   time testing is done.  I mean, so, I don't know what else we

14   could do.  You could argue in this in any case that something

15   improper could be done in any search warrant because the

16   arresting -- I shouldn't say the arresting officer, the

17   officer making application could have said something to the

18   judge.

19   MR. THOMPSON:  I don't want to speak out of turn

20   before I have the discovery available.  I would want to

21   reserve any application that might be appropriate following.

22   THE COURT:  I'm denying your application to suppress

23   based on both of you agreeing on what was in the second

24   affidavit that supported the second search warrant on the

25   residence signed by Judge Keenan.  If in the course of the

 1  first search -- of course, after getting the discovery that

 2  I'm directing, you see need for application, reapplication.

 3           MR. THOMPSON:  That's fine.

 4           THE COURT:  Again, so it's clear, I'm suppressing,

 5  for the reasons stated, the items seized, the four blocks

 6  seized from the business pursuant to the December 29th, 2005

 7  search warrant because they were not specified and based on

 8  Mr. Resnick's indication to the Court they were not in plain

 9  view, so there would be no theory that would justify the

10  seizure.  However, I'm denying the motion to suppression of --

11  you're indicating one block you intend to offer.

12           MR. RESNICK:  Your Honor, there were 99 blocks were

13  taken, 20 of those were brought to the lab and then the lab

14  started doing the testing and as soon as they found a positive

15  match between the vicitim and the defendant they stopped.

16  There is one block that shows a match.  I may ask them to go

17  and examine more for trial purposes, but I think it's their

18  procedure that once they find a match, they stop.  They didn't

19  examine all 99 blocks.  I don't want to be prohibited from

20  later on --

21           THE COURT:  At this point, to the extent there is an

22  application to suppress the one block that you would be

23  seeking to introduce, I'm denying that application to suppress

24  based on both counsel's acknowledgement that there is no

25  reference in the second affidavit, the one that supported

1  Judge Keenan's issuing of the February 1st, 2006 warrant that

2  made any reference to the fact that any positive samples were

3  found from the earlier warrant.

4           Let's move on to Rule 404 and 608.  At this point,

5  Mr. Resnick, I realize you're in the process of still

6  preparing the case, but at this point, and I realize that you

7  indicated you'll provide any more specifics two weeks before

8  trial, at this point are you aware of any 404(b) material?

9           MR. RESNICK:  No, your Honor.

10          THE COURT:  Again, I'll note that the government, to

11 the extent that you do intend to offer 404(b) material, that

12 is evidence on your direct case of other criminal conduct on

13 the part of Mr. Penev that you maintain would be relevant to

14 the knowledge or motive, et cetera, you'll do that within two

15 weeks?

16          MR. RESNICK:  Yes.

17          THE COURT:  Two weeks before trial.

18          MR. RESNICK:  Yes.

19          THE COURT:  With respect to impeachment material,

20 you've provided a copy of any criminal history check of Mr.

21 Penov.

22          MR. RESNICK:  I believe we did, but if we didn't,

23 I'm aware.

24          MR. THOMPSON:  He did.

25          THE COURT:  And, again, obviously you're reserving,

1  you wait two weeks before trial as to any prior bad acts, is

2  that correct?

3          MR. RESNICK:  Yeah, generally, your Honor, the prior

4  bad acts, 404(b).

5          THE COURT:  Typically two weeks before.

6          MR. RESNICK:  Yes.

7          THE COURT:  Do you know of any?

8          MR. RESNICK:  There were some things found on the

9  computer that I want to analyze and decide whether I want to

10  use.

11          THE COURT:  Two weeks before.  If you can do it

12  sooner --

13          MR. RESNICK:  The evidence has been provided to the

14  defendant, but I will.

15          THE COURT:  Minimun two weeks before trial we'll

16  notify the defense of any 404(b) material.  The discovery

17  inspection, has that now been clarified, Mr. Thompson?

18          MR. THOMPSON:  No, actually, it hasn't.  If I could

19  talk to that for just a moment.

20          THE COURT:  As far as we resolved the lab reports,

21  Mr. Resnick will check with the director of the lab and he

22  will provide any documentation relating to the DNA testing.

23          MR. THOMPSON:  Yes.  There are, I note, many

24  photographs.  I would request copies of those apparently

25  relating to the search warrants, those are in the subsequent

1   documentation that I have received or, I think there is

2   probably thirty to forty, at least, photographs.

3          THE COURT:  What is the nature of the photographs?

4          MR. THOMPSON:  It appears to be relative to the

5   searches that were conducted.

6          MR. RESNICK:  Pictures of the premises.

7          THE COURT:  Can you provide a duplicate copy of

8   those?

9          MR. RESNICK:  I would do that.

10          MR. THOMPSON:  I would ask that Mr. Resnick check or

11   the Court direct Mr. Resnick to check relative to handwritten

12   notes or rough notes relative to the earlier December 29th

13   search warrants, those were provided relative to the latter

14   search warrant of the business and done.  I don't know if they

15   exist relative to the earlier search warrants, but if they

16   don't, I ask they be checked for.

17          THE COURT:  Presumably the Government has no

18   objection to the direction that all rough notes be preserved.

19          MR. RESNICK:  No objection.

20          MR. THOMPSON:  We've talked about the subsequent

21   testing and the reports that might be generated relative to

22   that as they come along.  The other thing, aside from the

23   reports is, as you know from my motion, a copy of the

24   complaint in the computer hard drive.  Mr. Resnick did provide

25   me with the CD disk that contains a few things.  Essentially

1  electronic messages of the hard copy messages that I was

2  provided with an Internet history, I'm not sure if that is

3  complete or not, it appears to be scanable, it also contains

4  an access database, it's called, which is not able to be

5  examined at this point because it might just be the copying

6  process didn't go well or the disk is bad or what not, I

7  haven't been able to open the data base.

8           THE CUORT:  Mr. Resnick, you're objecting because

9  you're maintaining to provide the hard drive would provide the

10 defense with a lot of extraneous material, tax records,

11 personal information?

12          MR. RESNICK:  There is no reason to turn over the

13 whole computer.  There was a forensic test and all the

14 correspondence and the paths and where they're found, all that

15 information was provided to the defendant as well as the

16 alleged victim's Internet history.  If he wants to use that as

17 Brady, anything that relates to the victim has been provided

18 to the defendant.

19          THE COURT:  Why isn't that sufficient, Mr. Thompson?

20 It appears to the Court that Mr. Resnick makes a valid

21 objection that if this is indeed a family computer, I don't

22 know how you can call out a hard drive and then you're

23 provided with a lot of personal information that is in no way

24 relevant to the case.

25          MR. THOMPSON:  That would be an objection insofar

1   that it limits my ability to examine the location of these

2   hard copy printout documents that have been provided to

3   confirm that they are in fact on this drive and in the

4   location and correspond allegedly to the messages on my

5   client's drive or drive the --

6           MR. RESNICK:  I have a solution to that.  Instead of

7   counting on the forensic exam, if Mr. Thompson wants to sit

8   down with our forensic examiner, it's a real copy, I can show

9   him that.

10          MR. THOMPSON:  If that is acceptable to my expert,

11  it's acceptable to me and I'll propose that he attempt that

12  procedure.

13          THE COURT:  What you're suggesting, it seems

14  reasonable, that the two experts get together and the

15  Government expect can say here is where we found it.

16          MR. THOMPSON:  And he can go there and check it.  If

17  he is happy with that, I'm happy with that.

18          THE COURT:  I'll direct that, unless I hear

19  otherwise.   Anything else on discovery and inspection?

20          MR. THOMPSON:  Other than the items we talked about,

21  I think not.

22          THE COURT:  With respect to the Brady.  The leading

23  case, of course, here is the *Copa* case.  The Court will direct

24  the Government to comply with the Brady obligation.  It's

25  clear that whether something is Brady material it's up to the

 1 | government to determine in first instance.  The timing of the

 2 | disclosure is up to the government.  The government, however,

 3 | it if it fails to turn over Brady material in enough time for

 4 | the the defense to make use of it at trial, will face

 5 | appropriate sanctions.

 6 |         Jencks material, you'll turn it over two weeks

 7 | before trial?

 8 |         MR. RESNICK:  Yeah, most of it has been turned over

 9 | already.

10 |         THE COURT:  The Court will direct, assume there is

11 | no problem with reciprocal discovery.  The Government's

12 | request for reciprocal discovery?

13 |         MR. THOMPSON:  I didn't make objections to that.

14 |         MR. RESNICK:  Just with respect to that we noticed

15 | our two experts that we intend to use in this filing and I

16 | will provide --

17 |         THE COURT:  You refer to them not by name.

18 |         MR. RESNICK:  I'll provide that to Mr. Thompson.  I

19 | didn't ask specifically for it.

20 |         THE COURT:  So we don't run into later problems in

21 | this case, more is more.  Provide whatever information is

22 | required under Rule 16.

23 |         MR. RESNICK:  The rule also provides that the

24 | defense should provide the name.

25 |         MR. THOMPSON:  I don't have any problem with that.

1  Obviously he'll know of the expert.

2          THE COURT:  When you guys get together, both experts

3  will know each other by the time the case is ready.  Now,

4  counsel, the next thing is to set this down for trial.  Do you

5  want to deal with the superseding indictment?  I'm sorry,

6  there was a return -- do we have a copy of the superseding

7  indictment?

8          MR. THOMPSON:  I have a copy.

9          THE COURT:  Mr. Penov, it's my obligation to arraign

10  you on the superseding indictment that has been returned by

11  the Federal Grand Jury, and I'll read the count.  It says

12  beginning in or about earlier February 2005 and continuing on

13  or about December 26th, 2005 in the Western District of New

14  York and elsewhere, the defendant, Marian Asehov Penov, did,

15  by causing electronic communications to be sent via the

16  internet to an individual he believed was a 12 year old female

17  and then a 13 year old female, use a facility and means in

18  interstate and foreign commerce knowingly to persuade, induce,

19  and entice, and to attempt to persuade, induce, and entice, an

20  individual, he believed to be less than 18 years of age, to

21  engage in sexual activity for which he could be charged with a

22  criminal offense under the lasws of the state of New York,

23  namely a violation of one or more of the following sections of

24  the New York State Penal Law:  Section 130.06 (Sexual Abuse in

25  the Second Degree); Section 130.45 (Criminal Sexual Act in the

1  Second Degree); and Section 130.30 (Rape in the Second Degree)

2  all in violation of Title 18 U.S.C. 2422(b).  Thank you Mr.

3  Thompson.

4          Mr. Resnick, before Mr. Thompson formally enters a

5  plea on behalf of Mr. Penov, can you explain the penalties he

6  is facing and explain the differences between this indictment

7  and the earlier indictment.

8          MR. RESNICK:  Yeah.  With respect to the penalties,

9  this charge carries a mandatory minimum of five years in

10 prison and a maximum of 30 years in prison and a $250,000

11 fine.  With respect to the superseding --

12         THE COURT:  And supervised release of --

13         MR. RESNICK:  It would be up to five years, thirty

14 year maximum and $100 special assessment.  And with respect to

15 the changes in the indictment, really the only change is the

16 fact that the time period has now been extended from the first

17 indictment, September through December, now it says February

18 through December, based on the forensic exam.

19         THE COURT:  So, originally it said September 2005

20 through December of 2005, and now it's February of 2005 and

21 the penalties are exactly the same.

22         MR. RESNICK:  Yes.

23         THE COURT:  And the supervised release five years or

24 life?

25         MR. RESNICK:  For this type of crime recommended

1  that it's life.

2           THE COURT:  In any event, other than expanding the

3  time and you've provided all that discovery to Mr. Thompson.

4           MR. RESNICK:  Yes, all on the computers.

5           THE COURT:  Mr. Thompson, how does Mr. Penov plead?

6           MR. THOMPSON:  Not guilty.

7           THE COURT:  We'll note a not guilty plea has been

8  entered.

9           MR. THOMPSON:  I want to be clear on that.  There is

10 no additional discovery but for what's been previously

11 provided relative to the expanded date.

12          MR. RESNICK:  Yeah, that's accurate.  If you look at

13 what has been provided, you'll see the, first, what we allege

14 the contact between the defendant and the alleged victim'

15 occurred in February of '05.

16          MR. THOMPSON:  Okay, that's fine.

17          THE COURT:  Now, counsel, I note that everyone is

18 anxious, certainly Mr. Penov is anxious to have the matter

19 resolved and the Government is anxious to have the matter

20 resolved.  I assume we have 70 days left on the clock.

21          MR. RESNICK:  Minus a few days here and there.

22          MR. THOMPSON:  On the superseding indictment.

23          THE COURT:  It doesn't -- you may have a date from

24 the time it's returned to the day of arraignment.

25          MR. RESNICK:  I think Mr. Thompson had asked for

1  some extensions to file motions, there may be that he filed a

2  day or two later.

3         THE COURT:  When is our outside time limit?

4         MR. RESNICK:  I would use 60 days.

5         THE COURT:  What I would do then, I'll switch some

6  things, I'll put this down for trial December 4th.

7         MR. THOMPSON:  I know I have a trial that date in

8  Livingston County.  It will be about a week and a half, maybe

9  two weeks.

10        THE COURT:  Counsel, help me out.  I have a criminal

11 case starting the 27th that I could move, November.

12        MR. THOMPSON:  Can't tell you, Judge, because the

13 court security has my calander.  I remember the 4th date, but

14 I don't know what other dates I've got left over.

15        THE COURT:  Could we take a recess and you can use

16 the phone in my Chambers.

17        MR. THOMPSON:  Or I'll go back out and check may

18 calendar and come back in.

19        THE COURT:  Take a five-minute recess, set a date,

20 thank you.

21        (Whereupon, there was a break in the proceeding.)

22        THE COURT:  Note the presence of counsel and the

23 defendant.  Thanks for checking, Mr. Thompson.

24        MR. THOMPSON:  Sure, Judge.  During the break I had

25 an opportunity to talk to Mr. Resnick.  I have a proposal for

1  the Court, if you would like to entertain it.  First of all,

2  obviously, we have some additional discovery to be provided

3  and I don't know if that is going to give rise to the ability

4  to bring further motions or not.  I would suggest that perhaps

5  we come back in two weeks to give Mr. Resnick time to provide

6  that and give me an opportunity to examine it and determine

7  whether there are going to be additional motions or whether

8  there is going to be a trial date set without further pretrial

9  litigation.  The other thing I would suggest to the Court is,

10 this is, obviously giving the DNA testing that is involved and

11 a computer forensics involved, the complex matter that that

12 would result in the ability of the Court and in my application

13 which I would make to grant an exclusion if necessary.  I

14 don't know that it's necessary at this point.  This certainly

15 would seem to fall within that category of cases.

16         THE COURT:  Mr. Resnick.

17         MR. RESNICK:  No objection.

18         THE COURT:  Well, here is what we'll do then.  Two

19 weeks is sufficient time to make these determinations.

20         MR. THOMPSON:  I think so.  Now, depending upon how

21 cooperative the lab is with Mr. Resnick, I think, hopefully,

22 we'll have all of the information would be provided, we can

23 notify the Court beforehand.

24         THE COURT:  I'll put it on for Tuesday, October 24th

25 at 1 p.m.

1        MR. THOMPSON:  Judge, could we make it a little

2    later in day.  Mr. Penov is obligated to be in court that day.

3        THE COURT:  4 p.m. that will give Mr. Penov to make

4    his state court appearance.  The Court will put it on that

5    date for counsel to report back on any outstanding discovery

6    issues and any issues relating to the availability of any

7    expert witnesses.  The Court understands that one of the

8    solutions that we have with respect to the hard drive is to

9    have the two experts, one for the defense and one for the

10   government to get together, so the government expert can

11   inform the defense expert of where exactly he found the

12   relevant communications.  In that regard, to give counsel a

13   chance to do that, the Court will place this on for the 24th.

14   The Court will prospectively exclude the time from today's

15   date October 10th, 2006 through October 20th, in the interest

16   of justice pursuant to 18 U.S.C. Section 3161(h)(8)(A) and

17   (B).  Specifically the Court determines that the exclusion is

18   warranted in the interest of justice and the ends of justice

19   in granting the exclusion out weigh the interest of the public

20   or the defendant in a more speedy trial.  In making that

21   determination the Court has considered the factors set forth

22   in (8)(B).  Specifically the Court looks to factor (B)(2).

23   The case is complex.  The Court makes that finding based on

24   what has become obvious to the Court that there will be much

25   forensic analysis introduced at the trial that because a

1  computer is at issue here, the defense needs to retain its own

2  expert to examine the hard drive.  Additionally, this is a

3  case before the Government has indicated it intends to

4  introduce DNA testing and the defense obviously wants to

5  observe -- wants to examine the records supporting the DNA

6  testing and determine whether or not it may be in the defense

7  interest to attack the testing in some form.  So, the Court

8  determines, in relying on factor No. 2, that this is an

9  unusual case and the two-week exclusion is warranted in the

10  interest of justice, and the ends of justice are served by

11  granting such continuance and they out outweigh the

12  defendant's best interest of the public and of the defendant

13  in a speedy trial.  The Court notes that both sides are

14  requesting the opportunity to pursue on Mr. Resnick's behalf

15  whether any additional testing is required, to identify

16  further exhibits, provide to Mr. Thompson.  And the defense

17  specifically requested the exclusion based on complex nature

18  of the case and the need to properly represent Mr. Penov, to

19  consider the documents and advise him of additional expert

20  testimony.

21        Mr. Resnick, if you prepare an order, the Court will

22  exclude the time from today's date through October 24th in the

23  interest of justice, which, counsel come back.  If we

24  determine that all matters that need to be resolved have been

25  resolved, then the Court will then set a date for trial.

1  Anything else we need to address?

2          MR. RESNICK:  No.

3          MR. THOMPSON:  No.

4          THE COURT:  Again, the Court makes this finding

5  prospectively and, Mr. Resnick, submit an order and the Court

6  will sign it.  We'll see you back on the 24th at 4 p.m.

7                      REPORTER CERTIFICATION

8

9      I, Karen J. Bush, Official Court Reporter for the United

10 States District Court, Western District of New York, duly

11 appointed pursuant to provisions of Title 28 United States

12 Code Section 753, do hereby certify that I did report in

13 stenotype machine shorthand the proceedings held in the

14 above-entitled matter;

15     Further that the foregoing transcript is a true and

16 accurate transcription of my said stenographic notes taken at

17 the time and place hereinbefore set forth.

18

19

20 Dated  April 4, 2009

21 At Rochester, New York

22                          S/ Karen J. Bush

23                          _____

24

25