| | |
|---|---|
1                        UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF NEW YORK

2 ------------------------------------x

UNITED STATES OF AMERICA     :   Docket No. 06CR6009CJS

3                             :

                      vs.     :

4                           :   **REDACTED TRANSCRIPT**

MARIAN ASENOV PENEV        :

5                  Defendant   :

------------------------------------x Sentencing

Transcript of Proceedings

Before Honorable Charles J. Siragusa

United States District Judge

Wednesday

October 24, 2007

Rochester, New York

2:00 p.m.

A p p e a r a n c e s :

     RICHARD RESNICK, ESQ.
     Assistant United States Attorney
     6200 Federal Building
     Rochester, New York 14614

     DONALD THOMPSON, ESQ.
     16 West Main Street, Suite 243
     Rochester, New York 14614
     Attorney for Defendant

Reported By:

Karen J. Bush

Official Court Reporter

U.S. District Court - WDNY

(585) 613-4312

1      THE COURT:  For the record, this is the matter of

2  the United States versus Marian Penev.  You are Marian Penev

3  and you're appearing with your attorney, Mr. Thompson; is that

4  correct?

5      THE DEFENDANT:  Yes.

6      THE COURT:  The Court notes the presence of Mr.

7  Resnick on behalf of the government.  As you know, Mr. Penev,

8  this matter is on for sentencing and in that regard, I have

9  received and reviewed the presentence investigation report as

10 revised dated September 24th, 2007; the Government's statement

11 with respect to sentencing factors dated May 7th, 2007; and

12 the notice Mr. Thompson filed on your behalf of objections to

13 the presentence report and statements pending sentencing dated

14 September 17th, 2007 with the following attachments, which

15 were eventually partially filed under seal to redact certain

16 information; a letter dated January 8th, 2007 from your wife

17 Youlia Penev; an undated letter, which was attached from your

18 son Eddie Penev, including family pictures; a letter dated

19 April 13th, 2007 from your friend, Francis Casper; a petition

20 from gymnasts at Penev's Gym and parents in support; a letter

21 dated June 1, 2007 from Joanne Green-Blose, a parent of a

22 gymnast; a letter dated June 16th, 2007 from Linda Intini,

23 another parent of a gymnast; a letter dated June 5th, 2007

24 from Karen Gurnett, a parent of two of the gymnasts; a letter

25 dated June 11th, 2007 from Jeanine DiBeradinis, another parent

1  of a gymnast; an undated letter of Larry Goldsmith of

2  Gleason's Gymnastics of North Tonawanda; a letter dated June

3  6, 2007 from James Burton, a coach of Gleason Gymnastics again

4  in North Tonawanda; an undated letter from Ann Kist, the head

5  coach at Chelsea Piers, New York; a letter dated January 17th,

6  2006 from Karen Burnett, a parent of two gymnasts, she also

7  wrote an earlier letter; a letter dated January 18th, 2006

8  from Heather and Carl Stehler, parents of gymnasts; a letter

9  dated February 1st, 2006 from Debby Burkovich, a friend and

10  employee of Penev's; a letter dated March 14th, 2006 from

11  Robert Burkovich, a father of a gymnast; a letter dated

12  January 11, 2006 from Eric and Maria Murray; a letter dated

13  January 14th, 2006, from Lancelot and Jacquelyn Timothy, again

14  parents of a gymnast; a letter dated January 18th, 2006 from

15  Eric Libey, an employee and friend; a letter dated January

16  11th, 2006 from Karen and David Goldberg, parents of gymnast;

17  a letter dated January 15th, 2006, from Brittany Jencik, a

18  parent of a gymnast; a letter dated January 25th, 2006 from

19  Laura Gardner, a parent of a gymnast; a letter dated January

20  16th, 2006 from Venelin Tchamov, parent of a gymnast and a

21  friend of yours; a letter dated January 16th, 2006 from Jill

22  Nobles, parent of a gymnast; a letter dated January 18, 2006

23  from Greg and Chery Fosco, parents of gymnasts; a letter dated

24  January 18th, 2006 from Mary Ellen McGraw, an employee of

25  Penev's and a parent of a gymnast; an undated letter from

1  Ivaylo Grahovski, an employee and friend; a letter dated
2  January 15, 2006 from Laura Regan, a parent of a gymnast; a
3  letter dated January 17th, 2006 from Beth Hendrickson, an
4  employee of Penev's; a letter dated January 18th, 2006 from
5  Peter and Tanya G-u-o-r-g-u-i-e-v, friends; a letter dated
6  January 20th, 2006 from Euro Stars Gymnastics Booster Club in
7  support; a letter dated January 31st, 2006 from Mitko Iliev
8  and Diliana Angelova, owners of the Maple City Gymnastics,
9  friends; an undated letter from Gantcho Totko, a friend; a
10 letter dated February 3rd, 2006 from Galia Spassova, a friend;
11 a letter dated February 9th, 2006 from George Kostadinov; a
12 letter dated February 9th, 2006 from Ivan Alexov off, a
13 friend; a letter dated March 24th, excuse me, a letter dated
14 March 24th, 2006 from Elena Tororova, coach of Hills
15 Gymnastics, a coach from Gaithersburg, Maryland; a letter
16 dated March 25th, 2006 from Ivan and Luba Minaylov, friends;
17 an undated letter from Plamen Todorow, friend; and a letter
18 dated March 9th, 2006 from Hrabrina Spencer, is co-owner of
19 Gym Nest in Hunington, West Virginia; and a letter dated March
20 2nd, 2006 from Ivan Ivanov, a fellow coach and friend.  I
21 received, not directly, these were received attached to the
22 motion that was filed, I received directly from your wife
23 another letter dated September 17th, 2007 with a copy of the
24 newspaper article.  I received another letter from your wife
25 dated October 17th, 2007, that was -- again, these were

 1  provided directly to me and I provided them to counsel.  And a

 2  letter dated October 18th, 2007 from a Linda B-l-a-h-y-j, that

 3  again, I faxed directly to counsel.  And a statement from

 4  Nicholas Penev, and an ex-wife, Andrea Hartman.

 5          Additionally, I received a request on the part of

 6  the government dated September 24th, 2007 that reads as

 7  follows:  Title 18 of the U.S.C. Section 3771(a)(4) provides

 8  that the victim of a crime has the right to be reasonably

 9  heard at any public proceeding in the district court involving

10  release, plea, sentencing or any parole hearing.  Goes on to

11  say, "the minor victim will be attending the sentencing, but

12  it is still unsure at this time if she will make a verbal

13  statement to the Court.  However, the minor victim's parents

14  have expressed their wishes to be heard during the sentencing

15  hearing."  It's my understanding the victim's mother wants to

16  address the Court; is that right, Mr. Resnick?

17          MR. RESNICK:  I believe that's the case, yes, your

18  Honor.

19          THE COURT:  All right.  Now, just so we can clarify,

20  for purposes of the record, Mr. Resnick, has the Government

21  received the presentence investigation report and the other

22  submissions to which I referred?

23          MR. RESNICK:  Yes, we have, your Honor.

24          THE COURT:  And, Mr. Thompson, have you received the

25  presentence report and other submissions to which I referred?

1          MR. THOMPSON:  Yes, I have.

2          THE COURT:  Have you gone over them with Mr. Penev?

3          MR. THOMPSON:  Yes, I have.

4          THE COURT:  Mr. Penev, have you read the presentence

5    report yourself?

6          THE DEFENDANT:  Yeah.

7          THE COURT:  The Court notes, as counsel are aware,

8    that the plea was entered pursuant to Federal Criminal

9    Procedure Rule 11(c)(1)(C).  The Court now having had the

10   opportunity to consider the presentence report of September --

11   dated September 24th, 2007, and the submissions in connection

12   with the report will accept the plea agreement, therefore, as

13   you know, Mr. Penev, the Court having accepted the plea

14   agreement, as I explained, you can't withdraw your plea.  I

15   mention that because it should be clear, although from some of

16   the letters it appears it was not, that the plea agreement

17   that was entered included a recommendation from both the

18   Government and the defendant that the period of incarceration

19   in this case be 192 months, sixteen years.  Additionally, the

20   plea agreement provided that the defendant could receive a

21   term of supervised release of up to life and provided for a

22   fine range of $15,000 to $150,000.  I mention that because in

23   paragraph 18 of the plea agreement, as I mentioned when the

24   plea was taken, it reads:  "The defendant understands that

25   Title 18 of U.S.C. Section 3742 affords a defendant a limited

1  right to appeal the sentence imposed.  The defendant, however,

2  knowingly waives the right to appeal, modify pursuant to Title

3  18 of the U.S.C. Section 3582(c)(2) and collaterally attack

4  any component of his sentence imposed by the Court, which

5  includes a sentence of imprisonment of 192 months or less, a

6  fine and supervised release which falls within the range set

7  forth in section 2, which would include up to life, and a fine

8  the Court referred to, notwithstanding the manner in which the

9  Court determines the sentence.  The Court pursuant to Rule 11

10 did take care, Mr. Penev, to go over with you the agreement to

11 waive your right to appeal.  I mention that again because of

12 some of the letters that I did receive.

13          In any event, the Court having accepted the plea

14 agreement, will now move on to address the objections that

15 were raised by Mr. Thompson in his filing on your behalf.

16 Just some observations, again, in the objections, I don't know

17 whether I would characterize them as objections so much as

18 rearguments of the motions that the defense filed on April

19 18th of 2007, which the Court ruled on from the bench on April

20 19th of 2007.  The motion refers to, and I'm reading it, they,

21 referring to the victim's family, and their supporters sent a

22 barrage of letters requesting that the defendant receive a

23 sentence longer than that previously agreed to.  I don't know

24 if I would characterize it as a barrage of letters, I think,

25 and I went back and carefully reviewed the transcripts, the

1  letters that I referred to that were the subject of the

2  discussions at the time the Court indicated that it would not

3  accept the plea included a letter from the victim, a letter

4  from the victim's parents, a letter from a certified social

5  workers and then two additional letters, one from the victim's

6  grandmother and another letter from the gymnastics community.

7  Those were the letters that were discussed on April 12th of

8  2007, when the Court rejected the 11(c)(1)(c) plea agreement

9  that was originally proposed in this case.  And then which I

10  discussed again on April 19th, 2007 when ruling on the

11  Defendant's Notice of Motion that was filed the day before.

12  Again, I don't know if that could be correctly characterized

13  as a barrage.  In any event, the motion filed in connection

14  with sentencing again suggests that the Court, and I'm reading

15  from it, the Court's rejection of the plea agreement based on

16  new information contained in the victim impact letters and

17  PSR, which was not true, but rather within the knowledge of

18  both the parties and the Court and the Defendant and at the

19  time the Defendant's plea was entered.  Always giving counsel

20  the benefit of the doubt, I went back and had the transcript

21  of the detention hearing prepared.  I went back and looked at

22  the original plea agreement, and clearly, I was not in

23  possession of the information that I was in possession of at

24  the time I rejected the plea.  I did not know, as I specified

25  back on April 19th, the extent of the relationship between the

1  victim, the victim's parents and the defendant.  I did not

2  know until I received the letter from the victim's parents

3  that the victim's father and the defendant were close enough

4  friends that they were planning a fishing trip to Florida, at

5  least according to what was the representation in the letter.

6  Nor did I know that the victim's father apparently had helped

7  establish, I don't know whether by funding or otherwise, the

8  gym.  Additionally, I did not have the letter from the victim

9  that I've referenced.  Now, this Court, either as a judge or

10  as an attorney, has been practicing for over 30 years and I've

11  been involved in a number of cases involving allegations of

12  this nature, and I can honestly say, I've never had a case

13  where the victim wrote a letter, not to the Court, but to the

14  offender.  I'm not going to go into the details of the letter,

15  both sides have it, but certainly that letter struck the Court

16  as unusual and offered some insight into the Court as to the

17  impact that the crime may have had leading the Court to reject

18  the plea agreement.  Also, in the current sentencing motion

19  there is a reference that the Court was focusing on what the

20  victim's family wanted by way of a sentence and I just have to

21  respond, as I did on April 12th, where I said, I should note

22  at the outset, and I think it's important for all to

23  understand that when a Court reads victim impact letters,

24  they're certainly relevant to the Court's determination on

25  sentencing issues.  But, it is important to understand that

1  the Court does not read them to get an opinion that the

2  victim, or in this case, that the family members may have

3  about the appropriate sentence.  And I did not read them

4  concerning any characterizations they may have made of the

5  defendant, I read them for one purpose, the impact that the

6  crime had upon a victim.  And that's how I read them, limited

7  to the impact on the victim, I reiterated that on the 19th in

8  ruling on the motion.  There is another point in the

9  memorandum, in paragraph 8 on page 9, states "defendant makes

10  such challenge without regard to whether the Court intends to

11  adhere to the advisory Guideline range or depart from it since

12  were the Court to accept unsubstantiated allegations in the

13  presentence report, it could still sentence within the

14  confines of the Rule 11(c)(1)(C) plea, albeit to the top end

15  of the range.  The unsupported allegations would thus have the

16  effect of starting the Court's advisory Guideline calculations

17  at an artificially high number months."  I frankly don't

18  understand what that means.  I went back and compared the

19  numbers in the plea agreement to the numbers recommended in

20  the PSR in terms of the calculations under the advisory

21  Guidelines and they're, unless I made an error in my

22  calculations, the same.  So, I don't know what significance

23  that statement has.  In any event, the Court also notes that a

24  reference is made on page 5, along these lines, Exhibit A

25  delivered in hard copy to the Court and the United States

1  Attorney contains copies of photographs taken of, in some

2  cases by the victim, in this case, and posted by her or her

3  friends on the Internet after the completion of the

4  Defendant's conduct in the case that allegedly caused her to

5  suffer lifelong psychological damage.

6  Exhibit A tells a far different story, as is evident.  This

7  young lady is not uncomfortable or embarrassed by her

8  sexuality nor is she apparently hesitant about sharing the

9  descriptions of the intimate experiences involved in this case

10 with others.  Again, in the context of objections to the

11 presentence report, I'm not sure of what the significance is

12 because this was an 11(c)(1)(c) plea where the defendant and

13 the Government asked the Court, as I explained, to impose a

14 specific sentence.

15          In any event, with respect to what are characterized

16 as objections, the Court determines pursuant to the Federal

17 Rule of Criminal Procedure 32(i)(C) that a ruling, to the

18 extent that one is necessary or that one is being asked for on

19 these matters is unnecessary because the matters are not going

20 to affect sentencing and the Court will not consider the

21 matters in sentencing since this was an agreed disposition.

22 The one issue that remains, however, the defense has objected

23 to is the issue of restitution.  And the Court is frankly

24 puzzled by the issue of restitution.  And here is why.  By

25 letter dated September 27th, 2007, the Government, on behalf

1  of the victim, was requesting a total amount of restitution of

2  $6,624.45.  The Government requested reimbursement to the

3  minor victim in the amount of $4,260.75, and Excellus

4  Rochester Region in the amount of $2,363.70.  Now, it was

5  clarified when we were last in court that while the total

6  amount was the same, the actual request for the minor victim

7  was $3,397.15 and the additional $860.60 was appropriately

8  applied to the New York Victim's Compensation Board.  There

9  was no request for lifetime restitution.  In fact, when we

10 were in court on September 27th, 2007, the Court addressed the

11 restitution issue.  There was some discussion in the context

12 of the case being adjourned.  In pertinent part the Court

13 said, "but the Court has researched on lifetime, it can be

14 authorized, but there has to be -- the law is pretty clear, in

15 this case, Mr. Resnick, how could I possibly determine the

16 certainty of the amount?"  Mr. Resnick, "we've had an amount

17 that was paid up to date and that is all we submitted.  The

18 counselor says -- the Court, "you're not asking for lifetime

19 counseling fees."  Mr. Resnick, "I asked for something from

20 the counselor to provide what they believe would be future

21 sessions, they can't provide that information because it's

22 unethical.  So, based on that, you're right, I don't know how

23 I could articulate a number."  Went on to say, Mr. Resnick,

24 "I've been trying to get a firm number of something that the

25 Court could use as a basis to give us that number, but I don't

1  think I'm going to have that information.  I don't think

2  anybody is going to be able to provide that information

3  because I've been told it's unethical to try and anticipate

4  how much counseling is going to be needed."  The Court, "so,

5  if you cut through it all, what the government is seeking is

6  counseling fees to date."

7            "Yes, unless I can get a better number.  I've been

8  told that I can't."

9            Now, interestingly on the following day when you

10  weren't here, Mr. Resnick, when we were discussing this issue

11  again, Ms. Lee, who was appearing here for you on the issue of

12  restitution stated, but we have here is the victim's family is

13  willing to say or willing to live with the amount as of May.

14  And the Court commented that's not what they're saying.  But,

15  in any event, the reason I find this curious is because

16  subsequently days before sentencing, I received the following:

17  "In addition, and where the Government clarified the amount of

18  $6,624.45 to date, corrected the amount that goes to the

19  victim and the amount going to the New York State Crime's

20  Board and added, in addition, to the past expenses the

21  Government respectfully requests that future counseling

22  expenses be included in the restitution order.  In the victim

23  impact statement submitted by Corey C. Sorsey, licensed

24  certified social worker, Ms. Sorsey states that Kristi will

25  need to attend therapy at various times in her life more

1  vigorously than at other times.  For example, at significant

2  developmental milestones.  Overall Kristi will continue to

3  need treatment and the effects of the abuse are life long."

4  Now, I don't know if that means the victim will need treatment

5  at some point and the effects are life long or whether

6  treatment is life long, but in any event, what's interesting

7  to the Court is that is essentially exactly what the certified

8  social worker said in a submission that was given to me in May

9  -- excuse me, in March of 2007.  So, what I'm saying is the

10  government has been in possession of this information since

11  March of 2007.  As recently as September 27th, the Government

12  has represented that based on the information that it had it

13  couldn't make, consistent with case law, a recommendation for

14  lifetime counseling fees.  And, all of a sudden, despite the

15  representation and despite no information, there is request

16  for lifetime counseling fees.  Now, with respect to the

17  lifetime counseling fees, the Government did send as a follow

18  up to the request cases, and the Court reviewed the

19  Government's cases and additionally reviewed a case called

20  *United States vs. Doe* at 488 F. 3d 1154 at 1159 to 1160, which

21  is a 2007 Ninth Circuit case that essentially discusses the

22  cases that the government cited.  In pertinent part says,

23  "Section 2259 directs that an order of restitution under this

24  section" -- and that is the section we're operating under --

25  "shall direct the defendant to pay the victim (through the

1  appropriate court mechanism) the full amount of the victim's

2  losses as determined by the Court.  The full amount of losses

3  includes (A) medical services relating to physical,

4  psychiatric or psychological care," -- among other things.

5  "We have previously recognized that this section is phrased in

6  generous terms, in order to compensate the victims of sexual

7  abuse for the care required to address the long-term effects

8  of their abuse."  Goes on to say, "and although the breadth of

9  the statutory language is circumscribed by the requirement of

10 a causal connection between the offense of conviction and the

11 victim's harm, we and the other circuits addressing

12 restitution orders under Section 2259 have not imposed a

13 requirement causation approaching mathematical precision."

14 Goes on to say, "we recognized that there might be cases where

15 the amount of future counseling expenses would be too

16 difficult to ascertain to justify an award, but we found the

17 district court's estimate of the amount the victim was likely

18 to spend to be justified."  Interestingly enough, the case

19 also refers to Third Circuit case of *Crandon*, which I think

20 you cited, Mr. Resnick.  In that case, the Court agreed with

21 the district court that the proximate causation had been

22 established based upon a consideration of a treating

23 psychiatrist report and a licensed social worker's report on

24 the degree of impact on the victim.  Because there was some

25 issue, the defense took to the reliance on the report of a

1  licensed social worker.  It also significantly points out in

2  the *Doe* case that it emphatically rejected the argument that

3  it must be shown that a defendant's conduct was the sole and

4  total loss of the victim's loss, holding that "it was entirely

5  reasonable for the District Court to conclude that the

6  additional strain or trauma stemming from Crandon's actions

7  was a substantial factor in causing the ultimate loss."  In

8  sum, it said this:  "Thus, in every circuit to consider the

9  causation requirement of Section 2259, a rule of

10 reasonableness is applied.  We will uphold an award of

11 restitution under Section 2259 if the district court is able

12 to estimate, based upon facts in the record, the amount of the

13 victim's loss with some reasonable certainty."

14         Also of note is 18 U.S.C. Section 3664(d)(5) because

15 it says this:  If the victim's losses are not ascertainable by

16 the date, that is 10 days prior to sentencing, the attorney

17 for the government or the probation officer shall so inform

18 the Court and the Court shall set a date for the final

19 determination of the victim's losses, not to exceed 90 days

20 after sentencing.  Clearly that means if the Court had been

21 notified that the losses were not ascertainable by this date

22 and had the Court been advised of that 10 days before

23 sentencing then I could have postponed sentencing 90 days and

24 perhaps ordered a hearing.  But we come back to the fact that

25 based on the information that the Government had available,

1   and that is specifically the information from the licensed

2   certified social worker, which was in the Government's

3   possession as early as -- at least it was sent to me in March

4   of 2007, that the Government represented on September 27th

5   that, you know, lifetime counseling expenses could not be

6   estimated with reasonable certainty.  And, in fact, went so

7   far as to say that the Government had been unable to get

8   anyone to make such an estimate because it would be unethical.

9   So, based on that, based on the fact there was no request to

10  made 10 days in accordance with Section 3664 to postpone a

11  determination of the restitution issue because the Government

12  wanted to obtain further evidence.  The Court does not see how

13  under the law that it discussed that it can determine with

14  reasonable certainty lifetime counseling fees.  With respect

15  to the submission, I note, again, the Government is saying the

16  victim will need to attend therapy at various times in her

17  life more vigorously than other times.  For example, at

18  significant developmental milestones.  Overall, Kristi will

19  continue to need treatment without any indication of really

20  how long and the effects of her abuse are lifelong.  The

21  Government then goes onto then submit that the victim's life

22  expectancy is 78 years and she is 14 years now and 64 years

23  remaining and then states this times estimate 25 percent of

24  her life will need therapy based on Ms. Sorsey's conclusion,

25  I, frankly, don't see the connection.  I don't see any, and it

1  should be clear that the Government has the burden, as both

2  sides know, of establishing whether any objection is made,

3  restitution by a preponderance of the evidence.  The Court

4  doesn't see where, even forgetting the fact that the

5  government has already represented on the 27th that based on

6  what you had you weren't requesting lifetime counseling fees

7  because you couldn't ethically get the information, I don't

8  see where based on Ms. Sorsey's report that we come up with a

9  figure of 25 percent, and a total of 70,000 -- excuse me,

10 $72,487.29.  Perhaps if the Government had submitted the

11 literature that Ms. Sorsey relied on as accepted in the

12 profession some type of studies indicating that victims of

13 sexual abuse need counseling for such and such a time.  But,

14 for me, even setting aside the fact that the government

15 represented that they weren't asking for it based on the

16 information they had, they apparently shifted gears, the Court

17 doesn't feel that based on the law the Government has

18 established by a preponderance of the evidence with any degree

19 of reasonable certainty the amount of $72,487.29, and,

20 therefore, as to future counseling fees, the Court sustains

21 the objection.

22         Next, the Court briefly wants to address the letters

23 that it received in this case.  And it took me a long time to

24 go through the letters and I read them carefully.  Obviously,

25 as I hope was clear, I read the letters that had been

1    submitted on behalf of the victim, carefully, and ruled on the

2    issues raised by the defense.  I also read the letters

3    received from the defendant very carefully and, in fact, kind

4    of divided them into three -- into certain areas.  The first

5    area that I want to discuss is I want to make sure there is no

6    issue is what I referred to as the conflict issue.  A letter

7    written by Ms. Penev dated -- that I received and dated

8    September 17th, 2007, which I received on September 20th,

9    2007, indicates in part, and this was submitted with the

10   defense motion, "I'm left to wonder if the reason -- talking

11   about the treatment of Mr. Penev -- is due to U.S. Attorney

12   Bret Puscheck's direct personal connection to the gym, is that

13   not a conflict of interest."  A letter -- the last letter that

14   I received from Ms. Penev, the same time I received that I

15   received a letter from a Linda Blahyj that I received that

16   interestingly was emailed from the same time from the same

17   post office as the last letter from Mrs. Penev, but, and that

18   one she says, "one hopes that Mr. Puscheck's personal interest

19   in the case does not affect your decisions or create" -- again

20   that same phrase -- "conflict of interest."  The Court

21   received a letter that I referred to from Jeanini DiBerardinis

22   that says, again, in pertinent part discussing a conversation

23   with the victim's mother, the final statement she made is that

24   she and her husband are close friends with Richard Resnick,

25   U.S. District Attorney, and his wife.  She stated that Rich

1   Resnick's wife was in a nursing class, I always assumed it was

2   a conflict of interest with the prosecutor.  I want to

3   clarify, Mr. Thompson, is the defense making any application

4   relating to any type of conflict of interest?

5        MR. THOMPSON:  Judge, there is nothing in the record

6   that could support that application.  But, the underlying

7   facts are not unknown to the parties here.

8        THE COURT:  I just want to make sure, and the only

9   reason I mention that, I realize that you didn't send in a

10  couple, but one of the letters was attached to the submission.

11  So, the Court is satisfied there is no application, based on

12  your understanding of the law, as to any type of conflict of

13  interest?

14       MR. THOMPSON:  I'd like to clarify the facts for the

15  record, if I could, Judge.

16       THE COURT:  Yes.

17       MR. THOMPSON:  There is no application here, but

18  there is, at the same time, there is no question that there is

19  apparently a close relationship between Mr. Puscheck and the

20  Lachonskis, who have been active in the prosecution and there

21  is no question that Mr. Puscheck's children went to this gym,

22  left this gym and went back to this gym, I don't think there

23  is any factual question about that, nor that the Lichonskis'

24  children did the same thing.  There is no overt indication

25  that that played any role here in the manner in which this

 1  proceeding went forward.  You know, it's not unknown to the

 2  parties that you have a personal social relationship with Mr.

 3  Puscheck, Judge.  That you played basketball with him in the

 4  past and that you're friendly.  There is no overt indication

 5  that would support a conflict motion as to the proceedings

 6  here.  So I think that is probably the genesis of the

 7  statements that were made.  You know, as I say, the underlying

 8  facts are not unknown to the parties, but there is no

 9  indication in the record of a conflict.

10          THE COURT:  Okay. I'm just trying to clarify there

11  is no application for me to set aside the plea based on a

12  conflict of interest.

13          MR. THOMPSON:  I don't believe there is any basis

14  upon which I could support such application in the record,

15  Judge.

16          THE COURT:  Thank you.  I just wanted to clarify

17  that.  Now the next -- again, I want to refer -- as I said, I

18  tried to break the letters up.  Most of the letters are what I

19  would refer to as character letters that I received on behalf

20  of the defendant that are normally received in sentencing.

21  And that is letters that pointed out to the Court, despite, I

22  don't know whether they were written at the time the charge

23  was pending or after the plea, I think both were talking about

24  good things Mr. Penev had done in his life, contributions he

25  had made to gymnastics and generally speaking to his good

1  qualities.  Those were the majority of the letters.  There

2  were some letters which, again, may have well been written

3  before pleas were entered in State court and here in Federal

4  Court indicating to the Court that he was innocent.  For

5  example, one written by Ms. Spassova, S-p-a-s-s-o-v-a, said,

6  "knowing Marian for many years, I am positive that he would

7  not put his family and success in jeopardy.  The recent

8  accusations are undeserved and, in my opinion, quite

9  impossible to belive.  It seems that someone with destruction

10  intentions has conspired to tear apart Marian's fine work and

11  reputation.

12       The Mihaylovs write, "we have no doubt that Marian

13  is a person of impeccable character and integrity who would

14  never engage in any immoral or dishonest activity.  We believe

15  in his innocence."  Again I look at the timing and they were

16  written before pleas were entered, but nonetheless the Court

17  read them carefully.  There was one letter, perhaps two, that

18  explained to the Court -- that wanted to explain to the Court

19  the whole culture of gymnastics, took great pains to do so.  I

20  don't know if that was one letter or another which described

21  for the Court the fact that it's not unusual for parents to

22  drive their children who are pursuing gymnastics an hour and a

23  half to an appropriate facility.  There was reference to

24  driving an hour and a half to Penev's here in Rochester or an

25  hour and a half to a facility in Buffalo.  Then there were

1   some limited letters that, again, and I read these carefully,

2   that appeared to attack the victim and her family.  One read,

3   "in this particular case -- and these are all attached to the

4   filings, they are matters of public record -- "in this

5   particular case when I observed when the accused attended the

6   gym is that she was spoiled and behaved years beyond her age.

7   She had been warned of flirting with boys in the gym and it's

8   my understanding that her parents allowed her to date boys

9   much older than herself.  I do not blame the accuser for her

10  actions, she will behave based on the guidelines set by her

11  parents.  And when you do not have good parenting skills,

12  children go astray."  Another one, again, during this time,

13  reference to, "the victim's father was often present in the

14  lobby during his daughter's practices and often engaged in

15  conversations with parents and Mr. Penev after practice.  In

16  the beginning of December, again, while apparently monitoring

17  their daughter, who allegedly knowingly had apparently had

18  inappropriate conversations taking place.  Referred to the

19  mother had volunteered to purchase the team Christmas gift

20  from the team members for Penevs.  She organized the

21  collection of funds, purchased the gift and referenced the

22  mother and daughter actually presented the weekend getaway to

23  Mr. and Mrs. Penev at the party on December 15th, 2005, only

24  one week before having Mr. Penev arrested.  I can't even

25  imagine using either of my daughters as bait and I'm appalled

1  by their behavior.  To now be concerned about their daughter's

2  well-being is laughable and had they acted as responsible

3  parents in the first place, I believe they could have spared

4  not only their daughter's emotional stress, but the trauma

5  endured by everyone involved, especially Mr. Penev, Mrs. Penev

6  and their sons.  I point this out because much has been made

7  about letters that have the victim that were inappropriate,

8  talk about impact on the community.  Clearly I've been

9  presented with letters at the other end of the spectrum.

10          In any event, the Court has read all the letters

11  carefully and is prepared to proceed with sentencing.  Mr. --

12  and so we're clear on how we'll proceed, Mr. Resnick, once the

13  Government moves sentence, we'll give the victim's mother an

14  opportunity to speak, and you can then speak.

15          MR. RESNICK:  Yes, your Honor.

16          THE COURT:  We'll then allow Mr. Thompson to speak.

17  Mr. Penev, you will have the last word to the Court.  So, if

18  the victim's mother wants to speak, please come forward.

19  Mr. Resnick, do you move sentence?

20          MR. RESNICK:  Yes, your Honor.

21          THE COURT:  Ma'am, I'll only ask that you address

22  your comments to me.

23          VICTIM'S MOTHER:  Okay.  Well, that's not how I

24  wrote my letter.

25          THE COURT:  Go ahead.

 1          VICTIM'S MOTHER:  Thank you for allowing me to speak

 2   but my remarks are directed at the defendant.

 3          THE COURT:  Go ahead.

 4          VICTIM'S MOTHER:  It has been exactly one year, nine

 5   months and 27 days since our world was changed forever.  On

 6   December 27th, 2005, we discovered that our daughter was being

 7   abused.  I will not forget the sickness I felt upon coming to

 8   that realization.  My first reaction was complete denial.

 9   This must be a joke, this is something I'm not getting, you

10   would not do this.  But when I went to the gym and you saw me,

11   you looked so scared.  I remember you asking me is everything

12   all right, is it about gymnastics.  And when I pulled my

13   daughter out of practice, the look on your face, you were so

14   scared.  Even after it was confirmed by our daughter that this

15   was no joke, my head was swirling, it just couldn't be.  Thank

16   God my bother was there to call 911, it wasn't real.  I

17   couldn't think.  When we went to the police station, we were

18   told that your attorney had already called wondering what was

19   going on.  You immediately called your attorney, you knew you

20   were discovered.  Over these many, many months there are

21   mental images that continue to haunt me.  In January 2005, you

22   created a screen name, BWPBE.  You started Instant Messaging

23   with some of the gymnasts.  You taunted them to try and figure

24   out what that screen name meant.  I remember my daughter going

25   to a Bulgarian translation center website trying to figure it

1  out.  It wasn't until I was in the Monroe County

2  Investigator's office and my daughter revealed its meaning,

3  BWPBE, Barbie with the pretty blue eyes.  What were you

4  thinking?  I don't know when you first decided to target her,

5  but when you set up that screen name it was, to me, your first

6  step in your predatory actions.  Another event that goes

7  through my mind over and over is the Lilac competition

8  February 2005, our daughter's first event, vault, she makes

9  her passes and never vaults.  She ends up scratching.  We were

10 upset, but you were furious.  In fact, I had never seen you

11 leave the competition floor before to talk to a parent.  You

12 came upstairs and asked us what was going on.  This is what I

13 believe was your first realization that our daughter had

14 discovered boys.  After the meet, we went to a restaurant as a

15 team and you kept Jeff and I there for 45 minutes while the

16 restaurant was trying to close talking about how she could not

17 have any distractions in her life.  You were telling us that

18 she was too young, school and gymnastics had to be first, she

19 had to wait until she was older.  At the time we both noted

20 how adamant you were, no distractions.  The little voice in my

21 head went off but I didn't listen, I justified your behavior

22 you only cared about my daughter, you would never hurt her.

23 In May 2005, our daughter wanted to attend her best friend's

24 competition in Massachusetts.  I had to practically beg you to

25 allow her to go.  You did not want her to miss any practices.

1  I remember thinking I'm the parent, I get to the make these

2  decisions.  We allowed her to go, much to your dismay.  But it

3  was that weekend that you divulged the meaning of your screen

4  name to her.  Again, what were you thinking?  I remember you

5  wanting to drive her home that Saturday night so she could

6  practice, she was totally against it and would not allow it,

7  and we would not allow it.  Not that we didn't trust you, but

8  your driving record was atrocious and we didn't want her in

9  your car.  To this day that chills me, what would you have

10 done to her.  Then we come to her injury, a fractured pelvic

11 bone.  I'm taking her to physical therapy and I'm teaching you

12 how to massage her hamstring at practice.  Was it that action

13 that put you over the edge.  I remember her begging for us to

14 pick her up on time, don't be late she'd say.  We'd get there

15 and wait 45 minutes to an hour to be released.  Always the

16 last one.  It became a joke, she is always the last one done.

17 But that is how you planned it.  That is how you master minded

18 it.  She would say why does he always make me go last?  We

19 justify, so he can work more with you.  He has very high

20 expectations of you.  You should feel honored that he spends

21 so much time working with you.  Oh, God, if I could eat those

22 words.  How many times over the many years did we tell her,

23 listen to your coaches, they know best.  They will help you

24 fulfill your dreams.  It was during this time that you first

25 started to touch her under her leotard.  How horrifying for

1  her.  What was she to do?  I remember that summer how hard she

2  worked, both you and Youlia commenting on it.  When we were on

3  vacation, you called my cell phone three times.  I thought it

4  was odd, but justified as being concerned that she was

5  conditioning.  I remember forcing her to talk to you on the

6  phone.  She never wanted to.  I would say, he is your coach,

7  just talk to him.  What a fool I was.  I played right into

8  your plan.  I never understood her reluctance to talk to you

9  on the phone, but I do now.  In October or November you had

10 one of your coaches charged with abusing a cheerleader at your

11 gym, but you didn't tell anyone.  I pulled in the parking lot

12 after practice and saw three Monroe County Sheriffs there.

13 What was going on.  I asked Youlia, why are there three

14 Sheriff cars in your parking lot.  She spoke Bulgarian to you.

15 You flew out the side door.  You later explained there was a

16 parking problem.  Really?  Then we come to Thanksgiving.  We

17 again begged to go away to visit family.  You arranged for her

18 to practice at a gym down state.  The facility was not what

19 she was used to.  The vault runway was too short.  No room to

20 practice dismounts on beam.  I remember calling and telling

21 you about the situation and again forcing her to talk to you

22 on the phone.  It was at that time that she told me her period

23 was late.  I said, oh, honey, don't worry, sometimes our

24 bodies get all out of wack.  Little did I know that she

25 thought she had gotten pregnant.  She thought that you -- she

1  told you and you bought her a pregnancy test.  You tried to

2  get her to use it, even instructing her on how to.  She was

3  too scared.  I thank God she wasn't pregnant.  I later learned

4  that you told her if she was, it would ruin her family and her

5  gymnastics.  It is at this time that you decide that anal

6  penetration is what you'll do.  My poor daughter, she was only

7  13.

8           In December we find out that the coach was arrested

9  for child abuse.  Jeff confronts you at the gym, why didn't

10 you tell us.  You explained that you were advised not to tell

11 anyone by your attorney.  You call me at home and are very

12 upset that we are upset.  You defend your actions by following

13 your attorney's advice.  It was around this same period of

14 time that my daughter started acting out.  I discussed her

15 change in personality with you.  You talked with her as I

16 watched through the window.  I now know that you were the

17 cause.  The clues were there, I just didn't add them up.

18           As I write this, more and more events pop into my

19 head.  The team pool party, the dinner at Tapas, the evening

20 at your home, during all these times you were abusing her.

21 The change in our daughter through this ordeal and since has

22 been enormous.  How could it not be?  You stole her innocence,

23 her gymnastics and her identity and you stole her trust in

24 people.  You corrupted her thoughts.  You used her for your

25 perverse pleasure.  How pathetic is it when a parent has to

1  teach their 13-year-old child that men don't walk around with

2  erections, they can control them.  You had her believing that

3  that was normal male behavior.  You showed her a video of you

4  masturbating, you wore her underwear, you told her that you

5  were teaching her how to have fun.  Fun was supposed to be

6  gymnastics.  You held her dreams in your hand and it's been

7  said that she was not forced.  No, you didn't have a knife or

8  a gun, but you had her dreams.  She knew that she needed you

9  as her coach.  You were the best.  You had total control over

10  her.  You knew that she trusted so much, that we trusted so

11  much.  I had hoped and prayed that the man I knew, a kind and

12  caring man of integrity, would not have put us through this.

13  Yes, you must have been scared, but one year, nine months and

14  27 days it's taken to get here.  The evidence is overwhelming,

15  but you still lied.  Your lies have raked us over and over

16  again.  Your life is a lie.  You were never a man, only a

17  coward.  So today I will celebrate that we now can begin to

18  start the healing process.  I long for the days ahead when

19  your image doesn't enter into my mind, your name doesn't run

20  across my lips or my ears.  I long for the day that my

21  daughter can shout to the rooftops that she was abused.  She

22  is a survivor Without fear of harassment and retribution and I

23  truly long for the day when my daughter finds happiness in

24  herself and learns to trust again.

25            THE COURT:  Thank you.  Mr. Resnick, anything you

1 would like to say before the Court passes sentence?

2            MR. RESNICK:  No, your Honor.

3            THE COURT:  Mr. Thompson, anything you would like to

4 say on behalf of Mr. Penev before the Court passes sentence?

5            MR. THOMPSON:  Yes.

6            THE COURT:  Please proceed.

7            MR. GREEN:  Yes.  I realize that because the Court

8 has accepted the 11(c)(1)(C) plea agreement, that nothing I

9 say is going to change the ultimate sentence of incarceration

10 that is imposed by the Court, but I think it's important to

11 make some comments nonetheless.

12            THE COURT:  Go ahead.

13            MR. THOMPSON:  The Court noted earlier on that the

14 objections that were raised with respect to the presentence

15 report and the statements in the presentence report don't

16 affect the sentence and, therefore, there is no need for a

17 ruling, but it's been our contention, I want to be clear for

18 the record, that it's our contention that those

19 representations and the representations considered by the

20 Court in the letters that were sent by the victim's family and

21 the victim and the supporters are, our contention was, in an

22 untimely way prior to the filing of the PSR did affect the

23 sentence.  In fact, are precisely what led the Court to reject

24 the original plea offer that exceeded the Defendant's

25 calculated Guideline range and then we proceeded on to a new

1  negotiated offer.  And to that extent, my contention is that

2  those issues, as raised in the papers, and I won't go over

3  each one of them again, they've been filed already, did affect

4  the sentence.  We continue to put forth those issues we

5  contend, that a ruling that it is appropriate and necessary

6  for that reason.  I think what is clear here, and as I

7  indicated in response to the Court's inquiry earlier on, there

8  are no facts supporting a conflict of interest in this record

9  that would give rise to such a motion either -- well, that

10  would give rise to such a motion.  But, the thing that is

11  clear, and I think -- I don't think there is any dispute about

12  this is that Mr. Penev has been, for lack of a better word,

13  singled out or treated, in this case, as has no other

14  similarly charged defendant in this jurisdiction.  Not based

15  on particular facts, because we're familiar, you're familiar,

16  Judge, based on cases that you presided over and cases that

17  you've seen in the papers as being a member of this community

18  and I'm familiar with circumstances involving facts far worse

19  than this that have not resulted in this type of a sentence

20  nor based on the law, there is no other offender in this

21  jurisdiction charged with this offense that has been subjected

22  to this type of a sentence.  So, the question arises, is there

23  some other reason for this type of treatment?  And I suggest

24  here, as I suggested in the prior motion papers, as I

25  suggested in the prior submissions, that this Court has

 1   permitted the victim's family to have an improper influence on

 2   the proceedings.  Now, the Court, I will note, took the

 3   unusual step, not unwarranted, but not previously exercised in

 4   this jurisdiction that I'm aware of to speak specifically with

 5   the victim's family at the time the original plea was entered,

 6   and to determine whether they assented to that plea under all

 7   of the circumstances and for all of the reasons set forth on

 8   the record by the Court.  And, in the course of that

 9   proceeding, indicated that they did and then, thereafter, for

10   some reason, again not evident in the record, they changed

11   their position and expressed to the Court in letters sent

12   directly to the Court and in representations included in the

13   presentence report that was filed here originally prior to

14   statutory opportunity to object or be heard that they were

15   very unhappy with the plea, they were not satisfied with the

16   plea, that the defendant should receive additional time, in

17   their view.  And I respectfully submit that the factors that

18   the Court has set forth as a basis for rejecting the original

19   plea, the relationship between the parties, the families of

20   the parties and the conduct here of the defendant, I

21   respectfully submit that those were known to the Court in the

22   factual colloquy as set forth in the plea agreement and any of

23   the Guideline adjustments that were agreed to by both the

24   Government and the defendant in agreeing essentially to a

25   Guideline range in excess of what would otherwise be the

1  calculated range in this case.  I suggest that there is no

2  basis in the record, other than participation of the victim's

3  parents and their supporters for the change in position and

4  the rejection of the initial plea.  I too read all of the

5  letters that were submitted on both sides, Judge, and I too

6  was struck by the letters submitted by the victim.  And I

7  would contend to the Court that it is perhaps the most

8  appropriate letter that was submitted.  I note that it

9  includes, in my view, an attempt at understanding, an attempt

10  at reconciliation to reconcile what has taken place,

11  confusion, and I would note that it does not include, as many

12  of the other letters do, a focus on retribution or anger,

13  which has been largely part of the focus in these proceedings.

14  I think, you know, you noted, Judge, earlier on those letters

15  that attempted to convey the gymnastics community or sub

16  culture to the Court and the manner in which that sub culture

17  or community operates and, obviously, that's a very big part

18  of this proceeding, very big part in many different ways.  I

19  understand it's the context by which the victim's family came

20  to know Mr. Penev, but it's more than the context here given

21  the statement of the victim's mother.  It's still largely the

22  focus that that community, that sub culture, if you will, is a

23  factor in this case as in no other cases.  I would note for

24  the Court that in spite of the many amendments that have been

25  filed yet to the presentence report, and I think I noted this

1  in an objection, but I want to be sure, that the thing that

2  hasn't been amended is the presentence report still indicates

3  that Mr. Penev obtains a $2000 net income per month.

4  Obviously that isn't true and hasn't been true for some time,

5  relevant for the Court in determining whether a fine is

6  appropriate or the ability to pay a fine is evident.  The

7  other, for what it's worth, the other financial information

8  that's included in the presentence report is likewise not been

9  amended to this point and it's not particularly current,

10  essentially the same information that was included in the

11  first PSR.  We had amendments relating to other information.

12  However, not that information.  Can I have just a moment,

13  Judge?

14          THE COURT:  Certainly.

15          MR. THOMPSON:  There is a -- I think there is

16  representation in the last PSR as well as least one prior PSR

17  that Mr. Penev and his wife are legally separated, that is not

18  the case, actually.  They remain married at this point.  And

19  anticipate that they will in the future as well.  So, finally,

20  Judge, although, as I noted at the inception of my comments,

21  are not going to impact upon the sentence that the Court is

22  going to impose, having said that, the plea agreement in this

23  case, I think, it's relevant to note and important to note the

24  disparity in the sentence in this case and between the

25  sentence in this case and other cases involving similar or

1  worse facts in this community, other cases involving similar

2  charges.  And I'm not unaware that this is an 11(c)(1)(c) plea

3  agreement when I make those comments.  Nor am I unaware with

4  the choice Mr. Penev was faced, given the statutory maximums

5  and minimums in this case and the potential for sentencing, as

6  well as the other considerations here that weighed into the

7  entry of the plea agreement, including, not least, the desire

8  to spare the desire to spare -- the victim's family, Mr.

9  Penev's family, the arduous difficulty of a trial.  So with

10 that, Judge, I believe that Mr. Penev would also like to be

11 heard.

12          THE COURT:  Thank you.  Mr. Penev, if there is

13 anything you would like to tell me, you can.

14          THE DEFENDANT:  Yes.

15          THE COURT:  Please go ahead.

16          THE DEFENDANT:  Yes, your Honor.  I want to read my

17 letter that I have written like a month ago.

18          THE COURT:  Try to read it slowly because our

19 reporter is taking down everything.

20          THE DEFENDANT:  It took me a long time to read it.

21          MR. THOMPSON:  Judge, in that regard I'm happy to

22 provide a copy of letter to the court reporter to assist her

23 in transcription after the proceeding is over.

24          THE DEFENDANT:  Your Honor, I finally have the

25 opportunity to express what has been going through my mind for

1  more than a year and a half now.  This whole process does not

2  give me peace of mind, not for a second.  Not only with Kristi

3  a former gymnast of mine, whom I dearly loved and her family

4  too when which I also where it stands right now and, of

5  course, then there is my family and two sons, also.  It is sad

6  that my family and the xxxxxxxxxxxx family.

7           MR. RESNICK:  Your Honor, I don't mean to interrupt,

8  I object to the victim's name or any victim name or victim's

9  family for the record, I know it may be difficult.

10          MR. THOMPSON:  I don't oppose, but you included it

11  when quoting from the letter.

12          THE COURT:  I said the first name, I didn't mention

13  the last names.

14          MR. THOMPSON:  I don't have any objection to that

15  request.

16          THE DEFENDANT:  So what I do, I do.

17          THE COURT:  Refer to her the victim, the victim's

18  mother or father.

19          MR. THOMPSON:  Don't use the last name.

20          THE DEFENDANT:  Okay.  It is sad that my family and

21  the victim's family know each other very well yet seek

22  somewhere else who does not know us and to involve the

23  problems that we might have had between us and not to mention

24  in such sensitive matters, it takes two to figure out the

25  involvement and participation of if there was any ever since

1  this ugly argument began, I was hoping that we can reconcile

2  our difference of opinion, but instead it was all blown way

3  out of proportion treated by the media and newspapers.  And,

4  of course, our first instincts to retaliate or seek revenge.

5  When our loved and precious ones are believed to be hurt.  My

6  wrong doing has nothing to do with using, abusing, hurting or

7  forcing anybody against their own will or willing to do

8  anything that is for my self-gratification.  I have used a

9  computer, who hasn't, but for everything else but to entice

10 the victim into having sex with me.  By the way, I have never

11 ever been in a chat room and Mr. Puscheck should know that

12 that not only because I don't know how, but I have nothing to

13 say to people I don't know.  What I meant to say was not to

14 point a finger at somebody nor to be understood as if I am

15 accusing anybody of not being honest, but what I'm trying to

16 say in very plain and simple words is my wrong doing is not

17 what it's been portrayed to be.

18        Now, if I may introduce myself briefly, so you know,

19 as at least a bit about my past.  I was born in and raised in

20 Bulgaria, a former Communist country, coming from a very poor

21 family.  I started gymnastics when I was 7 in my hometown.

22 Later on when I was 14, I was selected to go to the national

23 center in the capital which is three and a half hours from my

24 hometown to train and compete there.  I was sometimes we were

25 intense practices for 8 to 10 hours a day.  I want to say this

 1  only because it's express like how my childhood was and how
 2  busy we were with just one thing and only, gymnastics.
 3          MR. THOMPSON:  Could we have just a moment, Judge?
 4          THE COURT:  Sure.
 5          MR. THOMPSON:  Thank you.
 6          THE COURT:  You're welcome.
 7          THE DEFENDANT:  I'm sorry if I read slow.
 8          THE COURT:  It's okay, you take your time.
 9          THE DEFENDANT:  It's not my original language.  I
10  did gymnastics for 18 years.  And in 1991 after big political
11  changes in my country, me and my wife decided to move to the
12  country in the country we liked.  I came to America to compete
13  in my last World championships, last of the four World
14  championships that I competed to.  And ever since then, we are
15  coaching in America.  In 1996, I was chosen for Coach of the
16  Year in New York State in 2000.  I was given a service award
17  from the U.S. Gymnastic Division 6 for bringing gymnastics a
18  higher level.  In 1998 we became -- the documents says 1999 --
19  we became citizens to America, in 1998 we became business
20  owners of the Rochester area.  And in 2006, considering the
21  circumstances, the business was sold.  For 32 years of my 39
22  at the time of my arrest I have done gymnastics, and not one
23  time, not even one -- not even in my worst nightmares did I
24  think that something like that would happen to me nor end up
25  in such places like prison.  I have no record of any kind of

1  wrong doing, not in my country nor in America.  And never

2  ever, not even in a flash in my mind I had any thoughts to

3  harm anyone, more so the gymnasts that we gave our lives for

4  and we dearly loved.  We teach our gymnasts, not only

5  gymnastics, but many other life lesson values like discipline,

6  hard work, consistency, respect, to appreciate things done for

7  them and never to quit trying if they fall in gymnastics or

8  stumble at something in their lives, and always to be polite

9  and humble when they win.  We have touched the hearts of

10 thousands of American gymnasts in such ways.  I speak we

11 because it would be me and my wife coaching together.  We are

12 -- we're delighted to have three of our gymnasts earn three

13 gymnastic scholarship to three universities.  However, there

14 is no guarantee whatsoever because even the most talented

15 gymnast, after many years of hard work, sometimes decide to

16 quit.  I am very sorry not to be able to finish what I have

17 promised to the victim, but on the other hand, maybe God has

18 saved her from bad injury because everything happens for a

19 reason, those reasons only he knows.

20         To the victim, if I may ask you to recall one more

21 time and only one more time whether there is anything that I

22 have taught you, said to you, advise you and tell you -- tell

23 your parents, not me, not the Court, not the silly

24 psychiatrist, if I have ever shown you any signs of disrespect

25 or selfishness towards you which may have led you to believe

1  that my intentions were to harm you, and if you don't find

2  any, then you'll know that what I taught you, said to you,

3  advised you is not done with intentions to harm you, but

4  because I care for you.  I'm positive that you will use these

5  teachings in future.  I want to make one thing clear, never

6  did I have the thoughts to hurt you, your family and my

7  family.  I was truly devoted to gymnastics and loved

8  gymnastics and loved every second coaching you and everyone

9  else.  I loved your family and that's how I want you to

10 remember it.  Now, if I may suggest one more thing to the

11 victim, put everything all behind you and if you need help

12 with anything, please seek the help of the Lord because there

13 is nothing too hard for him, instead of seeking help from a

14 psychiatrist who can only keep you stuck in the past repeating

15 the things that she or he can only assume and not allow you to

16 move forward.  You must let go of the past, for it has been

17 said that you cannot forget, but you can forgive.  By doing

18 so, you will let go of any negativity that might have been

19 built up in you and become a new person.  Once again, put all

20 things behind you because --

21        MR. RESNICK:  Your Honor, I'm going to object,

22 enough of this.  He is referring to the victim and talking to

23 the victim.  He is obviously not accepting his responsibility

24 that I thought he, you know, accepted.

25        THE COURT:  I understand.  Go ahead, Mr. Penev.

1          THE DEFENDANT:  Because all things from the past
2    have passed already and we can't rewind time to fix it, but
3    you can forgive and ask the Lord to help you to renew the
4    things that in you and ahead of you.  I want to share some
5    things with you and the Court.  One, it is very sad that no
6    one, including the society or the media, offers any support or
7    encouragement to my wife and sons in such matters.  A family
8    shall fall apart, which clearly shows that unforgiving and
9    society and world we live in.  There is not a day that passes
10   by without me experiencing and reliving the pain that the
11   victim, her family and my family are experiencing and going
12   through.  But this can and must end through forgiveness for
13   each other's wrong doing and let go of any hate that we may
14   have within us.  Everything I say came from my inner most part
15   of me.  So you know that everything lays open before you.
16   Your Honor, I understand that people do make mistakes and
17   mercy was in a case just like mine and charges were dropped
18   and the time given in that case was three times less than
19   mine.  Your Honor, if not, please consider my two sons and
20   wife.  Let the mercy be to everyone and the law be impartially
21   applied to everyone, not to those that are hated more.  I have
22   no record of any kind.  I have accepted responsibility and I
23   told you my heart goes out for the victim, her pains is my
24   pain magnified by all, and if the law is applied harsher to me
25   only because I'm hated more than the law is not the law.  Were

1  for what it stands not for everyone but praises for hatred.

2  Let's not destroy each other for our mistakes, but correct

3  each other so we don't make more mistakes.  After all, we as

4  society discipline our kids with constructive criticism rather

5  than harsh punishment that might destroy them.  Why not extend

6  our ways to everyone?  Your Honor, it is obvious what I'm

7  asking you, the prosecution, you, the prosecution and the

8  family involved, if they will agree, that by giving mercy to

9  me, you are also giving it to my wife and two sons by going

10 back to the first original 11(c)(1)(C) for the 10 years, which

11 we all previously agreed to.  Your Honor, please consider all

12 the facts because this is not a pray or grovel or indulge

13 case.  I want to finish this letter by giving my best and

14 sincere wishes for well-being now and the future from me

15 Marian to the victim, to her mom, to her dad, to her sisters.

16 And I will like to ask them if they will forgive me for the

17 pain I have caused them, even though I did not mean to do so.

18 I didn't read the whole -- can we submit it?

19          THE COURT:  It's up to Mr. Thompson, if he wants you

20 to read it, he can read it.

21          MR. THOMPSON:  We indicated that we can file.

22          THE COURT:  If that's what you prefer to do, that's

23 your call.

24          MR. THOMPSON:  I know it's difficult for him to read

25 in English and to make the process easier for him, I offer to

1  file the remainder of the statement.

2              THE COURT:  All right.

3              THE DEFENDANT:  Can I just say?

4              THE COURT:  Yes.

5              THE DEFENDANT:  I would also like to make the people

6  in the Court aware of how many times a person is punished for

7  stumbling in the law the first and only time.  For the

8  consequences that I would face it would be excessively long

9  prison time for the federal government as well as state prison

10  time on top of it, federal post-release supervision, which is

11  a prison with no walls, a felon for great life which I'll be

12  attacked like an animal with sex offender and on top of that

13  restitution.  And if that's not enough under what legally by

14  the law is punished, then on the personal level, the list goes

15  on.  I was abruptly taken from my wife and two sons and my

16  family, especially from my mother who I'll probably not going

17  to see again in my life.  I will not be there for my older

18  son's high school graduation, college years and gymnastics

19  career that has already taken into the world level.  I will

20  not be there for my younger son's high school graduation and

21  coaching him gymnastics.  My wife will be left alone to

22  support our two sons without my income.  We lost our business.

23  We've lost -- I've lost my coaching career, which is all I've

24  ever done and I've lost our entire life savings paying for

25  legal fees and the list goes on and on and on.  I just want to

1  know if this is a remedy for healing a person believed to be

2  hurt, is my life any less important since I have stumbled in

3  the law, and if this is justifiable for one and only one

4  stumble in the law.

5          THE COURT:  Mr. Penev, having heard your statement

6  the Court is prepared to pass sentence.  In that regard, I

7  have read carefully the presentence investigation report and

8  other submissions to which I've referred, including Mr.

9  Thompson's sentencing submission on your behalf and all of the

10  letters attached.  Additionally, I've listened carefully to

11  what the victim's mother said, to what Mr. Thompson said and

12  to what you said.  You stand before me, you're 41 years old.

13  You were born on September 1, 1966 and you're here for

14  sentencing after pleading guilty to one count of coercion and

15  enticement of a minor to engage in sexual activity, a class B

16  felony, in violation of 18 U.S.C. Section 2422(b).  As I

17  explained when you pled guilty, this crime is punishable by up

18  to 30 years in prison with a statutory minimum of five years,

19  a quarter of a million dollar fine or both.  On April 24th,

20  2007, you appeared before me and you pled guilty to this

21  charge.  Your plea was by way of a written plea agreement

22  pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal

23  Procedure.  As I explained, having reviewed the plea

24  agreement, and having reviewed the presentence investigation

25  report, I did, as I indicated, accept the plea agreement and

1  will sentence you in accordance with the recommendations that

2  you and the Government made.  As a condition of the plea, the

3  Government agreed not to oppose a recommendation that this

4  Court apply the three-level downward adjustment of Sentencing

5  Guidelines 3E1.1(a) and (b) for acceptance of responsibility.

6  That is, the government agreed not to oppose the

7  recommendation.  The presentence report on page 42 recommends

8  that you be accorded this, but I got to tell you, as I told

9  you when you pled guilty, you don't get this automatically by

10  pleading guilty.  In your comments to me, you showed the

11  victim no disrespect or selfishness, suggesting that what you

12  did wasn't that wrong, it wasn't -- you didn't abuse her and

13  it wasn't for self-gratification.  I truly question whether

14  you accepted responsibility.  But for the fact, but for the

15  fact, it's not going to affect sentencing in any way, I'd be

16  inclined to decline granting you acceptance.  However, as I

17  indicated, it's not going to make one bit of difference in the

18  calculations in this case.

19          In your plea of guilty, you acknowledged, you

20  admitted, you told me that at all times relevant you were a

21  gymnastics coach in the Western District of New York.  That

22  between February of 2005 and December 26th of 2005, you

23  engaged in Internet chats and email correspondence with an

24  individual, one of your girls that you coached, who you knew

25  to be 12 years old and then 13, was residing in Rochester.

1  During these chats and email conversations, you admitted that

2  you had sexually explicit conversations with the minor.  What

3  wasn't objected to in the presentence report was the codes

4  that were apparently used to refer to sexual activity and

5  sexually intimate parts.  You acknowledged that during these

6  chats and conversations, you discussed with her sexual conduct

7  which you intended to engage in the future.  You admitted that

8  you used the Internet to entice her to have sexual activity

9  with you.  You admitted that the sexual activity and conduct

10  involved were crimes under New York State Law, as witnessed by

11  the fact that you pled to rape second in New York State Court.

12  And you admitted that the sexual activity took place while the

13  minor child was in your care and custody and under your

14  supervisory control.  Back on December 4th of 2006, you pled

15  guilty to three counts of rape in the second degree and six

16  counts of criminal sexual act, felonies under New York Law, as

17  well as endangering the welfare of a child.  As has been

18  discussed, the state court judge agreed to give you a sentence

19  to run concurrent with this.  It's being reiterated by Mr.

20  Thompson that the Court was in possession of all the facts

21  that it claims it learned from the letter based on the prior

22  plea agreement.  That's simply not true.  I have the prior

23  plea agreement.  You reference, Mr. Thompson, there was no new

24  information other than what was contained in the plea

25  agreement.  That is simply not the case.  The plea agreement

1  does not tell me, as the letter by the parents did, that they

2  helped build the business and socialized outside of the gym.

3  It does not tell me that the victim's father was planning to

4  go deep sea fishing.  And, as I indicated, does not tell me

5  the extent of the harm as was clear to the Court in reading

6  the victim's letter.

7          In any event, as we discussed when you pled guilty,

8  Mr. Penev, sentencing in this action is pursuant to the

9  Sentencing Reform Act of 1984.  As indicated, Mr. Thompson has

10 received a copy of the presentence investigation report and

11 reviewed it with you, and further, you've indicated to me that

12 you read the report yourself.  Other than the Court has

13 sustained your objection as to lifetime counseling fees for

14 the reasons that it set forth on the record, including the

15 Government's prior representations, I've indicated that with

16 respect to other matters, there is no need for me to rule

17 pursuant to Rule 32(i) of the Federal Rules of Criminal

18 Procedure, other than those objections, the Court does adopt

19 the statements contained in the presentence investigation

20 report as its findings of fact.  In deciding on a reasonable

21 and appropriate sentence, Mr. Penev, the Court is aware of its

22 responsibility to impose a sentence sufficient, but not

23 greater than necessary to comply with the purposes of

24 sentencing as set forth in 18 U.S.C. Section 3553.  As

25 required by the section, I've considered all of the following

1  factors:  The nature and circumstances of your crime and your

2  history and characteristics; I've considered the need for the

3  sentence imposed to reflect the seriousness of your crime.

4  And despite what you seem to suggest, this was a serious

5  crime.  I've considered the need for the sentence imposed to

6  promote respect for the law, and provide you just punishment

7  and to send a message of deterrence that we can't in a

8  civilized community tolerate this kind of conduct.  I've

9  considered the need for the sentence imposed to provide you

10  with the care or treatment in the most effective manner.  I've

11  considered the sentences available, those called for under the

12  statute.  I've considered the advisory Sentencing Guidelines.

13  And I've also considered, despite what you suggest, the need

14  to avoid unwarranted sentencing disparities among defendants

15  with similar records who have been found guilty of similar

16  conduct.  In that regard, Mr. Penev, this child was under your

17  care since age what, 7?

18           MR. RESNICK:  5, your Honor.

19           THE COURT:  5.  You were her coach.  She grew from

20  childhood into adolescence under your guidance, often

21  spending, as apparently, although I don't understand it in the

22  case in gymnastics, up to five to sometimes seven days

23  training.  You directed her life.  I've not been involved in a

24  case like this.  Despite the references that I've caved to the

25  pressures by the victim's family, that simply is not true.  I

1  take my oath much more seriously than that.

2          With respect to the Sentencing Guidelines, the Court

3  has made the following calculations in accordance with the

4  Second Circuit's direction in *Gonzales* and *Crosby.*  I found

5  that your base offense level was 24.  That's what you agreed

6  to in the plea agreement, that's what the presentence report

7  recommends, and that's what I find.  I find there should be a

8  2-level increase because the child involved was in your

9  custody and care and your control.  Again, that's what the

10 plea agreement recommends, that's what you agreed to in the

11 plea agreement, that is what the presentence report

12 recommends, and that's what I find.  I find there should be

13 another 2-level increase because you unduly influenced the

14 minor to engage in sexual conduct.  Again, that's what you

15 agreed to in the presentence report, that's what the -- excuse

16 me -- in the plea agreement, that is what the presentence

17 report recommends, and that's what I find.  I find that there

18 should be another 2-level increase because the offense

19 involved a computer.  Again, that's what you agreed to in the

20 plea agreement, that is what the presentence report

21 recommends, and that's what I find.  I find that there should

22 be an additional 2-level increase because the offense involved

23 the actual commission of the sexual act or sexual contact.

24 Again, that's what the plea agreement recommended and you

25 agreed to, that's what the presentence report recommends and

1  that's what I find.  If you add up those numbers, that takes

2  your offense level to 32, exactly the calculation in the plea

3  agreement.  Now, do I reduce it by 3 for acceptance of

4  responsibility despite the fact that I question whether you

5  do?  I will reduce it to 29, only because it's not going to

6  affect the sentence.  If indeed your offense level is 29, your

7  criminal history category is I, that is undisputed, the

8  recommended sentence under the Guideline range would be 87 to

9  108 months, the recommended period of supervised release is

10 life, probation, you're not eligible, the fine range is

11 $15,000 to $150,000, and the restitution, as I have

12 determined, is $6,624.45.  While those are the Guideline

13 recommendations, you agreed to 192 months.  You could have

14 gone to trial, you could have reserved your objections, as I

15 asked you at the time you pled, I asked you specifically,

16 based on your conversations with Mr. Thompson, did you believe

17 entering into this plea agreement and pleading to the charge

18 was what was best for you to do, and your response was that it

19 was.  As I've indicated, upon reviewing all the facts and

20 circumstances set forth in the presentence report, I do

21 believe, under the unique facts and circumstances of your

22 case, that the sentence is reasonable, just and appropriate

23 under law.  You suggest to me, Mr. Penev, that your family is

24 suffering.  You know what, they are.  I have no doubt.  I've

25 watched the letters from your wife progress from telling me

1  about your background to anger after she reads a case in the

2  paper where someone received a sentence less than yours, to

3  questioning whether I'm fair, and curiously to me saying that

4  she believes you'll be vindicated in the appeals process.  You

5  agreed to waive your right to appeal.  But I understand that.

6  As counsel know, I supplied letters that I received from a

7  Mark Sutton, which I have, so the record is clear, dismissed,

8  other than the fact that Mr. Sutton was trying to help you and

9  I accept him, as I did the other character letters.  I say

10  that because I understand that your family is grieving.  But

11  you know whose fault it is?  It's yours.  It's not the

12  victim's, it's not the victim's family, it's yours.  This girl

13  was a child in your care from age 5.  To suggest that you

14  treated her with -- that you didn't disrespect her or weren't

15  selfish is offensive.  And in one of the letters in support of

16  your character it was mentioned that the writer doesn't feel

17  you're a predator, I disagree.  I believe you are a predator.

18  A predator is someone who devours or destroys.  You indeed

19  destroyed this child's innocence, and you destroyed her

20  dreams.  And to suggest anything less is simply not true.

21  This was not, to use your words, "blown out of proportion."

22  The sentence you are receiving that you agreed to is fitting

23  and deserved.

24          In passing sentence, Mr. Penev, the Court carefully

25  considered all the facts and circumstances surrounding your

1  conviction as well as the objectives of sentencing set forth

2  in Section 18 U.S.C. Section 3553.  Pursuant to the Sentencing

3  Reform Act of 1984 and U.S.C. Section 3553, it is the judgment

4  of the Court that you, Marian Penev, are hereby committed to

5  the custody of the Bureau of Prisons to be imprisoned for a

6  term of 192 months, that is sixteen years.  The cost of the

7  incarceration fee is waived.  It's ordered that you pay

8  restitution in the total amount of $6,624.45 as follows:  To

9  Excellus of Rochester, $2,362.70; to the minor victim,

10  $3,397.15; to the New York State Victim's Compensation Board

11  $863.60.  The Court finds that the government has established

12  those amounts by a preponderance of evidence based on the

13  submissions included with their initial letter of September

14  27th.  You shall make restitution payments from any wages you

15  earn in prison in accordance with the Bureau of Prisons Inmate

16  Financial Responsibility Program.  Any portion of the fine --

17  of the restitution that is not paid in full at the time of

18  your release from imprisonment shall become a condition of

19  supervision.  At that time you shall make monthly fine

20  payments of at least 10 percent of your monthly gross income.

21  Payments are to be made in the form of a money order made

22  payable the Clerk, United States District Court, 68 Court

23  Street, Buffalo, New York, 14202.  Based on the restitution

24  that I'm imposing, I determine that you can't afford to pay a

25  fine and, therefore, a fine is waived in this case.  However,

1   it's ordered that you pay to the United States a mandatory

2   special assessment which is due immediately.  Upon your

3   release from imprisonment, you shall be placed on supervised

4   release for life.  Now, in making a determination that you be

5   placed on supervised release for life, the Court noting that

6   it is encompassed in the plea agreement also notes 18 U.S.C.

7   Section 3558(3), which states factors to be considered in

8   including a term of supervised release.  The Court in

9   determining whether to include a term of supervised release,

10  and if a term of supervised release is included, in

11  determining the length of the term and the condition of the

12  supervised release shall consider the factors set forth in

13  Section 3553(a)(1).  I have considered all of those factors.

14  One of the factors that I can consider is 825, that is a

15  policy statement.  The Court has considered the policy

16  statements set forth in U.S.S.G., that is United States

17  Sentencing Guideline 521.2(c), which reads, "if the instance

18  offense of the conviction is a sex offense, the statutory

19  maximum term of supervised release is recommended."  The Court

20  is, of course, aware that the fact that the Sentencing

21  Guidelines recommend a lifetime term of supervised release

22  does not make it per se reasonable and the Court is obligated

23  to consider all of the applicable factors in fashioning an

24  appropriate sentence.  The Court has done this in considering

25  lifetime supervised release.  I would also note the case of

1  *Hobbs vs. Westchester County*, 397 F. 3d 133 at 145 to 146,

2  where the Second Circuit stated, "moreover, the fact that the

3  Prohibition creates a lifetime ban is reasonable in light of

4  the recognition in the cases that the risk of recidivism posed

5  by sex offenders is frightening and high, and that contrary to

6  conventional wisdom, most reoffenses do not occur within the

7  first several years after release, but may occur at late as 20

8  years following release."  That is the Second Circuit.  I do

9  find considering all the factors set forth in section 18

10 U.S.C. Section 3553 that a term of lifetime term of supervised

11 release, is appropriate in your case and order that you be

12 placed on supervised release upon your release for life.

13 While on supervised release, you shall not commit another

14 federal, state or local crime and are prohibited from

15 possessing a firearm, ammunition or other dangerous device.

16 In addition, you shall not possess a controlled substance and

17 shall comply with the standard conditions adopted by this

18 court.  Since the instant offense occurred after September

19 13th, 1994, drug testing is required by the 1994 Crime Control

20 Act.  Additionally, pursuant to the Justice for All Act of

21 2004, you shall cooperate in the collection of a DNA sample

22 that will be submitted to the national DNA registry.  In

23 addition, you shall comply with the following special

24 conditions.  If required, you shall register with the state

25 sex offender agency in any state that you reside, are

1  employed, carry on a vocation or are a student, and shall

2  provide proof of registration to your supervising probation

3  Officer.  You are to have no unsupervised contact with any

4  child under the age of 18, excluding, while I realize that

5  your children may well be beyond the age of 18 when you get

6  out, I'll exclude any biological or adopted children, I don't

7  know what will happen when you get out, without a responsible

8  law abiding adult aware of your background and/or conviction.

9  The probation office has the discretion to -- the fact that

10  you have further children -- to allow you to pick up any

11  children from school or other functions, however authorization

12  must be obtained in advance.  You are to avoid all areas where

13  it's likely that children may congregate, such as playgrounds,

14  theme parks, arcades, recreational facilities and recreational

15  parks unless prior approval has been obtained by the probation

16  office.  The Court notes this direction is in accordance with

17  the Second Circuit's case law.  And I think, and I'm imposing

18  in the case based on the nature of your conviction, I can't

19  help the fact that, but emphasize again that this child was in

20  your care from age 5 to the time that you chose to engage in

21  the horrific conduct that you did.  I have to go back a

22  second.  I don't know what you mean by you don't discipline

23  your kids.  You're not a kid.  You're a man, you were a man

24  when this happened.

25          You must provide the probation office with advance

1  notification of any computers, automated services or connected

2  devices that you will be used during the supervision.  Again,

3  this condition is based on the fact that you utilized a

4  computer and admitted to it to help facilitate the offenses

5  against this child.  The probation office is authorized to

6  install any application necessary to surveil any activity on

7  the computers or connected devices that you own and operate.

8  You may be required to pay the cost of monitoring services,

9  the monthly rate provided by the probation office.  The rate

10  and payment are subject to periodic adjustments.  The

11  probation office shall be notified via electronic transmission

12  of any impermissible or suspicious activity occurring on the

13  computer or connected device consistent with the computer

14  monitoring policy in effect by the probation office.  As

15  triggered by impermissible or suspicious activity, you shall

16  consent to and cooperate to unannounced examinations of any

17  computer equipment that you own or operate.  The examination

18  shall include, but is not limited to, retrieval and copying of

19  all media and any internal or external peripherals that my

20  involve conducting a more thorough inspection.  You are to

21  enroll, attend and participate in mental health intervention

22  specifically designed for the treatment of sexual offenders as

23  imposed by the probation office, and you're to comply with the

24  mandates of the treatment program and not to leave treatment

25  until discharge is agreed to by the probation office and/or

1  the Court along with the treating agency.  The Court

2  authorizes the probation office to address third-party risk

3  issues with employers.  Additionally, as long as you owe any

4  money by way of restitution, you're to provide the probation

5  office with any post or pre-sentencing financial information

6  whether it's personal or business.  They may turn that over to

7  the United States Attorney in order to use in the collection

8  of any restitution.  Finally, you shall submit to a search of

9  your person, property, vehicle, place of residence or any

10  other property under your control based upon reasonable

11  suspicion and permit confiscation of any evidence or

12  contraband discovered.

13          Now, pursuant to the plea agreement, as I've already

14  indicated, and specifically pursuant to paragraph 18, you have

15  agreed to waive your right to appeal and collaterally attack

16  any component of the sentence imposed by the Court, which

17  includes a sentence of imprisonment of 192 months or less, a

18  fine, which I didn't impose, supervised release of up to life,

19  which I did, and, of course, the $100 special assessment and

20  which falls within the range set forth in section 2.  As you

21  know, in regard to the restitution issue, restitution is

22  mandatory, but I've sustained the objection as to restitution.

23  That is the sentence of Court.  Are there any other matters we

24  need to address, counsel?

25          MR. PUSCHECK:  Dismissal of Criminal Complaint.

1          THE COURT:  The Court will, based on the

2   Government's application, dismiss the Criminal Complaint.

3   That is the sentence of the Court.

4                    REPORTER CERTIFICATION

5

6        I, Karen J. Bush, Official Court Reporter for the United

7   States District Court, Western District of New York, duly

8   appointed pursuant to provisions of Title 28 United States

9   Code Section 753, do hereby certify that I did report in

10  stenotype machine shorthand the proceedings held in the

11  above-entitled matter;

12       Further that the foregoing transcript is a true and

13  accurate transcription of my said stenographic notes taken at

14  the time and place hereinbefore set forth.

15

16

17  Dated  March 24, 2009

18  At Rochester, New York

19                                  s\ Karen J. Bush

20                                  _____

21

22

23

24

25